**DAVID P. COOPER, OSB NO. 88036**
Email: cooper@khpatent.com
**ELIZABETH A. TEDESCO, OSB NO. 05093**
Email: tedesco@khpatent.com
KOLISCH HARTWELL, P.C.
520 SW Yamhill Street, Suite 200
Portland, Oregon 97204
Telephone:          (503) 224-6655
Facsimile:          (503) 295-6679

**SETH H. OSTROW (admitted *pro hac vice*)**
Email: sostrow@dreierllp.com
**ARIANNA FRANKL (admitted *pro hac vice*)**
Email: afrankl@dreierllp.com
**KARINE LOUIS (admitted *pro hac vice*)**
Email : klouis@dreierllp.com
DREIER LLP
499 Park Avenue
New York, New York 10022
Telephone:          (212) 328-6100
Facsimile:          (212) 328-6101

*Attorneys for Plaintiff NetRatings, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NETRATINGS, INC.,**<br><br>**PLAINTIFF,**<br><br>v.<br><br>**WEBTRENDS, INC.,**<br><br>**DEFENDANT.** | **Civil No.  3:06-cv-1420-HA**<br><br><br>**PROPOSED CLAIM CONSTRUCTION HEARING DATE: OCTOBER 29, 2007, 9:00 a.m.**<br><br><br>**NETRATINGS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

POINT I  BACKGROUND ..........................................................................................2

A.    CASE HISTORY .................................................................................................2

B.    THE PARTIES.....................................................................................................2

      1.    Plaintiff NetRatings, Inc. .........................................................................2

      2.    Defendant WebTrends, Inc. .....................................................................3

C.    NETRATINGS' PATENTED INVENTIONS .....................................................5

      1.    Technology Background ...........................................................................5

      2.    The '510 and '680 Patent Family.............................................................8

      3.    The '637 Patent ......................................................................................10

      4.    The '386 and '155 Patent Family...........................................................12

POINT II  CLAIM CONSTRUCTION PROCEEDINGS .........................................13

A.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................13

B.    CLAIM CONSTRUCTION PROCEEDINGS IN THE PRESENT CASE.......15

POINT III  NETRATINGS' PROPOSED CONSTRUCTIONS ...............................17

A.    TERMS FROM THE '510 AND '680 PATENTS ............................................17

      1.    *local computer use meter/user meter (CCC at row 1)*...........................17

      2.    *installed in user computer machines (CCC at row 2)*...........................18

      3.    *log of predetermined [machine operation] events (CCC at row 3); log (CCC at row 3); events (CCC at row 4); machine operation events (CCC at row 5); logging predetermined events by a plurality of local computer use meters (CCC at row 6)*...........................................................................................21

      4.    *stored in memory of said computer machines (CCC at row 7); stored in an associated user computer machine (CCC at row 8); storing each of the events in said log in the local computer memory of said user computer systems (CCC at row 9); storing said log of predetermined events by each use meter in an associated user computer machine (CCC at row 10)*...........................24

      5.    *identify titles of open windows and reflects a log of titles of worldwide web pages (CCC at row 11); identify titles of windows and world wide web pages (CCC at row 12)*...........................................................................................26

      6.    *dictionary/dictionary file (CCC at row 13)* .........................................28

      7.    *correlates said titles to identifiable labels (CCC at row 14)*................29

      8.    *generating a log of machine operation events in each of a plurality of user computer systems (CCC at row 15)* .......................................................30

i

9. *transferring said stored events from said plurality of user computer systems to a processing station computer (CCC at row 16)* ....................................................30

10. *wherein said log of predetermined events identifies character strings reflecting on-line activity (CCC at row 17)* ......................................................................31

B. TERMS FROM THE '155 AND '386 PATENTS .................................................32

1. *executable program (CCC at row 19)* ..................................................32

2. *tracking program (CCC at row 20)* .....................................................32

3. *the tracking program is embedded in the Web page ('386 patent) (CCC at row 21); executable program not being part of the resource ('155 patent) (CCC at row 22)* ...........................................................................................33

4. *monitor use of the resource; resource use data (CCC at row 24); monitoring input device events (CCC at row 25); monitoring details of choices made by a user of the first client using an input device of the first client (CCC at row 26); monitor interaction through the client computer with at least one of the first resource and one or more second resources (CCC at row 27)* ....................................35

5. *client identifying indicia (CCC at row 28)* .........................................36

6. *[comprises] data representative of a plurality of preferences of a user (CCC at row 29); [comprises] data representative of a plurality of interests of a user (CCC at row 30)* ...........................................................................................36

7. *storing the resource use data in the client computer (CCC at row 31)* ................37

8. *server  (CCC at row 32)* ..................................................................38

9. *downloading the tracking program from a second server of the one or more servers (CCC at row 33); the first server and second server comprising two servers (CCC at row 34)* ............................................................................38

10. *downloading of the first resource causes the downloading of the tracking program (CCC at row 35)* ..............................................................................39

11. *the one or more second resources having been obtained by the first  client from a server of the one or more servers as a result of interaction through the first client with at least one of the first resource and a second resource of the one or more second resources (CCC at row 36)* ............................................................39

12. *computer usable medium; computer readable media ['386 patent] (CCC at row 37); computer readable medium ['637 patent] (CCC at row 37)* ........................40

C. TERMS FROM THE '637 PATENT ......................................................................41

D. APPLICATION OF 35 U.S.C. § 112 (6) TO THE '637 AND '510 PATENTS ..............41

1. *Means Plus Function Terms* ..................................................................42

2. *"Instructions" Terms* ..........................................................................47

CONCLUSION.............................................................................................................49

# TABLE OF AUTHORITIES

## CASES

*Acumed LLC v. Stryker Corp.*,
  483 F.3d 800 (Fed. Cir. 2007) ...............................................................................14

*Affymetrix, Inc. v. Hyseq, Inc.*,
  132 F. Supp. 2d 1212 (N.D. Cal. 2001) ................................................................48

*Bd. of Regents of the Univ. of Texas Sys. v. Eastman Kodak Co.*,
  No. SA-04-CA-912-XR,
  2006 U.S. Dist. LEXIS 7997 (W.D. Tex. Jan. 26, 2006) ......................................42

*Blount Inc. v. Trilink Saw Chain, LLC*,
  No. 06-CV-767-BR, 2007 WL 1725220 (D. Or. Jun. 8, 2007) .......................13, 14

*Bose Corporation v. JBL, Inc.*,
  274 F.3d 1354 (Fed. Cir. 2001) ..............................................................................31

*Brike Int'l, Ltd. v. Invacare Corp.*,
  No. 05-1754-KI, 2007 U.S. Dist. LEXIS 44003 (D. Or. Jun. 14, 2007) ...............42

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) ..............................................................................23

*Columbia Sportswear North America, Inc. v. Cerf Bros. Bag Co.*,
  No. CV 05-1960-PK, 2007 WL 1792304 (D. Or. Jun. 19, 2007) ...........................14

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ..............................................................................29

*Cybor Corp. v. FAS Techs.*,
  138 F.3d 1448 (Fed. Cir. 1998) ..............................................................................41

*Digeo, Inc. v. Audible, Inc.*, No. C05-464 JLR,
  2006 U.S. Dist. LEXIS 22715 (W.D. Wash. Mar. 27, 2006) .................................42

*Energizer Holding, Inc. v. International Trade Commission*,
  435 F.3d 1366 (Fed. Cir. 2006) ..............................................................................31

*Karlin Technology Inc. v. Surgical Dynamics, Inc.*,
  177 F.3d 968 (Fed. Cir. 1999) ................................................................................33

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004) ..............................................................................47

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ......................................13

*McKesson Info. Solutions LLC v. The Trizetto Group, Inc.,*
    426 F. Supp. 2d 197 (D. Del. 2006).......................................................................................42

*Nystrom v. Trex Co.*,
    424 F.3d 1136 (Fed. Cir. 2005)...............................................................................................24

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005)...............................................................................................19

*Phillips v. AWH Corporation*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................................ *passim*

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001)...............................................23

*Tom Hayden Enters. v. S. Or. Hot Bikes, Inc.*, No. 03-3034-CO,
    2004 U.S. Dist. LEXIS 8195 (D. Or. Apr. 29, 2004) .......................................................47, 48

*Universal City Studios, Inc. v. Reimerdes*,
    82 F. Supp. 2d 211 (S.D.N.Y. 2000).......................................................................................48

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)...............................................................................................42

## STATUTES

35 U.S.C. § 112 (6) ......................................................................................................... *passim*

## MISCELLANEOUS

Robert C. Faber, *Landis on Mechanics of Patent Drafting*,
    (Practising Law Institute Third Ed. 1990). ............................................................................22

*Manual of Patent Examining Procedure* (Thomson/West 8th ed. 2006) ......................................31

iv

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. ("NetRatings") submits this opening brief in support of its construction of terms from the asserted claims of the patents in suits, along with a Claim Construction Chart ("CCC") which identifies the terms in dispute and the parties' respective constructions for such terms.

This case is a dispute between competitors in the growing field referred to as web analytics, in which companies track and report on how people use various resources on the web. NetRatings, in this business since 1997, owns a portfolio of key patents in the field, five of which are asserted in this case (the "asserted patents").[1]  WebTrends, Inc. ("WebTrends") is one of several competitors sued by NetRatings for infringing the asserted patents.[2]

NetRatings' proposed constructions follow the mandate of the Federal Circuit by relying on the intrinsic evidence, affirmed by relevant dictionary and treatise definitions, while WebTrends' constructions repeatedly limit the claims to described embodiments and impose arbitrary limitations on terms without basis in the intrinsic evidence.  WebTrends' tactics appear to be a futile effort at avoiding infringement, but WebTrends will be shown to infringe, even under its own constructions.  Still, the asserted patents must be construed properly and in a manner which will facilitate the jury's understanding at trial.  NetRatings' constructions meet

---

[1]  The asserted patents, annexed as Exhibits A-E to the Declaration of Seth H. Ostrow, dated Sept. 19, 2007, that has been filed herewith, are U.S. Patent Nos: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); 6,138,155 (the "'155 patent"); 6,763,386 (the "'386 patent"); and 6,108,637 (the "'637 patent").  Hereinafter references to the Ostrow Declaration will follow the form: "Ostrow Decl. Ex. __".

[2]  Since 2005, NetRatings settled lawsuits with and licensed the patents to multiple companies in the web analytics field including: Visual Sciences, LLC; Sagemetrics Corp.; Omniture, Inc.; Coremetrics, Inc.; Unica Corporation; and WebSideStory, Inc.  Claim construction proceedings with respect to the asserted patents were held in two of these cases: *NetRatings, Inc. v. Coremetrics, Inc.*, 05-314 (D. Del.) and *NetRatings, Inc. v. WebSideStory, Inc.*, 06-878 (LTS) (AJP) (S.D.N.Y.).  In both cases, briefing and a *Markman* hearing occurred but the parties settled prior to a *Markman* decision being issued.

these goals and satisfy the prevailing standards for claim construction.  Accordingly, NetRatings'
constructions should be the Order of this Court.

## POINT I

## <u>BACKGROUND</u>

### A.    Case History

NetRatings filed its complaint on or about October 5, 2006.  *See* Docket Item ("DI") 1.
Pursuant to the Supplemental Joint Submission Regarding Scheduling entered on March 2, 2007
(DI 24), on April 2, 2007 the parties exchanged lists of terms in the asserted patents for
construction, and exchanged the proposed meaning of the terms on April 23, 2007.  As explained
further below, WebTrends subsequently replaced most of its original constructions with alternate
proposed constructions on August 24, 2007.  The parties then proceeded to meet and confer to
reduce the number of terms to be construed by the Court, which met with limited success. [3]

### B.    The Parties

#### 1.    Plaintiff NetRatings, Inc.

NetRatings, founded in 1997, is part of The Nielsen Company family of businesses, and a
subsidiary of the well known ACNielsen Corporation and Nielsen Media Research, Inc.
("Nielsen").  The Nielsen companies engage in consumer research in various media such as the
Internet, television and mobile technologies.  NetRatings provides Internet and digital media
measurement and analysis to clients world-wide in the media, technology, advertising, financial
services, consumer products, retail and travel industries.  NetRatings offers a broad range of

---

[3] The parties agreed that the following terms initially identified do not require construction: from the '386
patent: "the choices being associated with at least one of the first resource and the one or more second
resources choices being associated with a first or second resource"; "embedded"; "storing resource use
data associated with the monitored interaction"; "resource"; and from the '680 patent: "identifies
character strings reflecting online activity."  NetRatings, however, reserves the right to construe these
terms, if necessary, in response to WebTrends' opening claim construction brief.

technology-driven Internet information products and services that enable customers to make informed decisions regarding their Internet strategies.  For example, NetRatings' products provide the ability to learn what web sites users are visiting, details regarding Internet user preferences and advertising campaign effectiveness.  NetRatings' products also provide, among other things, the ability to learn the frequency with which users visit various web sites, the frequency with which advertisements from various advertising campaigns are selected by users, and details regarding Internet user preferences.  NetRatings' products provide browser-based measurement information on individual sites, such as finding out where customers enter a web site and how they navigate through the content.

NetRatings and its parent company Nielsen acquired the asserted patents over a period of time from various parties.  The asserted patents were invented and filed between 1995-1997, during the early development of the World Wide Web, by entrepreneurs who had the vision to recognize new commercial opportunities on the web and ways to improve upon them.  In turn, NetRatings and Nielsen recognized that these inventors had made significant contributions to their fields in ways that related to their businesses, and accordingly obtained the rights to the patents through a series of transactions ranging from 1997-2003.

### 2.    Defendant WebTrends, Inc.

WebTrends traditionally was a company whose products collected web analytics data by utilizing server-side data collection.  However, after years of using its server-side methods, WebTrends realized it needed to catch up with the rest of the industry and switch over to the patented technologies.  As explained by WebTrends itself in early 2003, data collection using server-side technology suffered from significant flaws, including "data accuracy and administrative problems."  Ostrow Decl. Ex. F at cover page (1/24/03 White Paper).  "As a result, more and more organizations [implemented] an alternative technique for capturing site

3

traffic information called *Client Side Data Collection*, or Data Tagging for short." *Id.* (italics in original). As described by WebTrends, its client-side data collection technique worked by "embedding tags on web pages to transmit relevant data to a centralized data collection facility." *Id.* at 2. The "tag" was "a small piece of scripting code, typically JavaScript, which transmits page-specific information via query string parameters" back to WebTrends' data collection servers. *Id.* at 2. According to WebTrends, "[w]hile the specific implementation varies between web analytics vendors, the general approach is the same across all commercial products and services that utilize data tagging." *Id.* at 2.[4]

"[D]ata tagging solves many problems intrinsic to web server log file analysis." *Id.* at cover page. WebTrends described several of these problems in its January 2003 White Paper. For instance, WebTrends wrote "the first problem with web server log file analysis is that *the vast majority of the data captured in web server log files has limited use in understanding visitor behavior."* *Id.* at 1 (italics in original). Further, a "related but more serious issue with web server log files is the potential accuracy problems they create. *In many cases web server log files do not accurately represent the actual visitor interaction with a web site."* *Id.* This can result in situations where "the most popular pages of your site [have] a relatively small number of hits appearing." *Id.* Still further problems with server-side log files is "the daily administrative burden they create. *Collecting and analyzing log files from multiple web servers, especially if they are geographically dispersed, is often tedious and sometimes problematic."* *Id.* Still further, server-side collection does not track user interaction within resources. In the example provided by WebTrends, Macromedia Flash-based applications "*do not produce log files. Web server logs will contain hits to pages containing the Flash application along with hits to the*

---

[4] When referring to other vendors, WebTrends likely meant other web analytics companies such as those which have already licensed the asserted patents. *See* n. 2 *supra.*

application itself, but no information is captured on how visitors behave *within* the Flash application. This is a rather profound problem for organizations choosing to use Flash." *Id.*

As WebTrends concluded, "[d]ata tagging solves all of these problems, while introducing some of its own. If none of the aforementioned issues has a substantial impact on your business, feel fortunate and continue to use your log file analysis tool as you do today. Otherwise read on. We'll continue by discussing how data tagging works." *Id.* While it is not surprising that WebTrends would temper its criticisms of the server-side data collection methods it had been using and promoting for years, WebTrends' adoption of the client-side data collection techniques several years ago and its continued use of that technique today, leaves no doubt about the significance of the technology, both to WebTrends and to the industry. *See also* Ostrow Decl. Ex. G, The ClickZ Network, *WebTrends Unites ASP and Software Versions* (Jan. 23, 2003) (WebTrends' new products more accurate because not "distorted by caching or proxy servers and excess hits from spider, crawlers or other automated applications"); and Ex. H, John Clyman, *WebTrends: Show Me the Traffic* (July 1, 2003), at 2 ("Using information actively reported by browsers (rather than crunching a server log file) also promises improved accuracy, particularly when it comes to accounting for users behind proxy servers. And it lets you collect and analyze a variety of data that normally wouldn't be available in server logs.").

As explained below, what WebTrends realized in 2003 about the deficiencies of server-side data collection and the advantages of client-side collection were first recognized by the inventors of the asserted patents up to eight years earlier.

**C.      NetRatings' Patented Inventions**

      **1.      Technology Background**

In computer networks, such as the Internet, individual computer users use their computers (which may also be referred to as "client" computers) to access various types of resources on the

network.  These resources, examples of which are commonly known (such as web pages, games, ad banners, *etc.*), are sometimes also referred to as "content."  In the context of the Web, resources generally consist of HTML documents.  An HTML document is stored on a server located at a content provider site (*e.g.,* servers operated for a retail store like Sears) and is made up of text and references to other resources, or content, from different locations on the Web.  *See, e.g.,* '637 patent, col. 2, ll. 24-29; '155 patent, col. 5, ll. 17-27.

Client computers use a computer program such as a browser (*e.g.,* Microsoft's Internet Explorer) to select and display web pages stored at different content provider sites.  *See* '637 patent, col. 2, ll. 6-12.  Generally, a client computer makes a "request" to a server computer at a content provider site to obtain the content and, upon receipt of the request, the server computer at the content provider site transfers the content, such as an HTML document for a web page, to the client computer.  *See, e.g.,* '637 patent, col. 2, ll. 11-24.  The browser at the client computer uses the HTML document to generate a display of the web page or other resource on the client computer.  '637 patent, col. 2, ll. 28-36.

With the rapid expansion of the use of personal computers during the early 1990s, the dissemination of electronic information and the desire to measure the use of computer related resources increased significantly.  '510 patent, col. 1, ll. 10-33.  However, until the inventions described in the asserted patents, information regarding such use was only collected at the server side, that is, the location of the server computer which received the requests for content.  The server computer would log every request for content that was received by it, creating a record that is often referred to as a "log file."  *See, e.g.,* '637 patent, col. 1, l. 65 – col. 2, l. 36.  This server side data collection method had a serious disadvantage however.  Specifically, it did not (and still cannot) provide information about what was occurring at the client computer (or "client

side") after the content left the server.  For instance, the server computer, while capable of recording every request that is received by it from multiple client computers, cannot record requests made by the same client computers to other server computers.  Thus, a company like Sears can determine, using its server computer, how many requests were made for content at its own web site, but Sears cannot determine how many requests were made at JC Penney's web site.  Similarly, Sears cannot tell whether the same Internet user that made a request at its web site, also made a request at the JC Penney web site.  Nor can Sears determine, using its server computer, what an Internet user did with the content Sears provided in response to the request.  In other words, the server computer cannot capture what is occurring at the client computer or monitor the user's display, use or interaction with the content it provides.[5]

The numerous, significant inventions claimed in NetRatings' asserted patents solved these and other problems associated with the prior art.  The inventions of the '510 and '680 patents provided the breakthrough technology of putting software on the client computer to monitor what Internet users were doing on the web.  Through the inventions of the '510 and '680 patents, it is now possible to determine what web sites multiple Internet users are going to, and what web sites individual Internet users have been to.[6]  The inventions of the '637 patent took this technology a step further in delineating that the software used to monitor what was occurring at the client computer be downloaded from content provider sites, and using such software to

---

[5] There are other deficiencies with server side data collection, including, for example, that the log file may not accurately represent unique requests for a single Web page, may be subject to manipulation, or may not accurately reflect the requestor, *etc.*  '637 patent, col. 2, l. 62 – col. 4, l. 31.

[6] Thus, where software on the server side can log how many requests for content were made at *one specific* Web site, software on the client side can log how many requests for content were made by each client computer to *any* Web site.  The software used at the client side may be written in many computer programming languages, such as C++, Java or Javascript, to name just a few examples.  A preferred language is one which is platform independent – and therefore can be implemented on most client computers, regardless of the specific configurations of such computers.  *See, e.g.,* '637 patent, col. 11, ll. 42-52.

monitor the display of content that was downloaded to the client computer.  Finally, with the inventions of the '155 and '386 patents, additional ways of obtaining the monitoring software were identified and the collection of specific details regarding Internet users' use and interaction with resources, such as web pages, was enabled.  Collectively, all of this technology now forms the basis for the web analytics industry.

### 2.    The '510 and '680 Patent Family

The '510 and '680 patents relate to monitoring – using software located on individual client computers – what individuals are doing on their computers and analyzing and reporting on the collected data.  *See* '510 patent, col. 1, ll. 5-8; col. 2, ll. 12-50.  This is accomplished by capturing data at the client computer that identifies what software applications and resources, such as web pages, the user is accessing.  *See, e.g.,* '510 patent, col. 1, ll. 22-23, 36-44; col. 2, ll. 21-50. Collected information is transmitted from the individual computers to a central processing location, where the information from many individual computers may be assimilated, translated, evaluated and reported on.  *See, e.g.,* '510 patent, col. 2, ll. 62-67.  The data collected, for example, identifies or describes open windows on a client computer (as in one example of the '510 patent, identifying an e-mail window from America Online) or strings of characters reflecting on-line activity (as in an example from the '680 patent, a URL which specifies a location on the web).[7]  *See, e.g.,* '510 patent, col. 4, ll. 12-24; col. 2, ll. 35-50.

In one embodiment, as shown in Figure 1 from the '510 and '680 patents reproduced below, a meter (1) installed on a personal computer logs events occurring at that computer, such as a user's accessing a web page, and transmits (at 2) the data (11) to a central processing station. The central processing station collects data from multiple separate personal computers and loads

---

[7]  URLs, or Uniform Resource Locators, identify locations on the Web from which data or a computer program may be downloaded.

the data into a database (13). A data dictionary (14) interprets the data and the interpreted data is used to generate reports (at 6) showing information derived from the data. Accordingly, the web usage activity from multiple individual users is collected and reports can be provided that show information such as how many different people went to a particular web site, or what different web sites a specific person visited.



*FIG.1*

Fig. 1, '510 and '680 patents.

9

### 3.    The '637 Patent

The '637 patent describes improved ways of delivering computer code to user computers over a network and for monitoring the display and observation of content provided to such users over the network.  *See* '637 patent, col. 1, ll. 5-12.  In particular, the '637 patent describes programs that enable monitoring, at user computers, of details associated with the display of content in a particular web page to produce monitoring information from which conclusions regarding the observation of the display may be deduced.  '637 patent, col. 6, ll. 44-48.

In one embodiment, as shown in Figures 3A, 3B and 3C of the '637 patent, reproduced below, a request for a web page is made to a content provider such as a website.  *See* Fig. 3A. The computer code for monitoring the display of the web page is transferred to a user computer with the web page.  *See* Fig. 3B.  *See also* '637 patent, col. 11, ll. 57-63.  In various embodiments of the '637 invention, the computer code detects details regarding the display of the Web page, such as how long the web page was displayed, whether it was displayed at the same time as another web page and the size or position of the display.  *See, e.g.,* '637 patent, col. 13, ll. 30-67.  The collected information is then transferred back to the content provider, as shown in the example of Fig. 3C or to a third party that collects and reports on such information on behalf of many content providers.



Figs. 3A-3C, '637 patent.

4.      **The '386 and '155 Patent Family**

The '386 and '155 patents build on the core data collection mechanisms provided in the '510, '680 and '637 patents by describing techniques for alternative delivery of monitoring programs to users and for monitoring details of individuals' use of and interaction with resources such as web pages.  *See, e.g.,* '155 patent, col. 1, ll. 12-17.  In some embodiments, a tracking program for collecting data regarding the use of the resource is downloaded from a different server on the network from the server that provided the resource.  *See, e.g.,* '155 patent, claim 1.  The server that provides the computer tracking program in this latter example can be dedicated to providing the program to multiple client computers.  This may be beneficial in permitting, among other things, changes to be made to the program at the one server rather than at all the different client computers.

As described in the '386 and '155 patents, the type of data collected might include data regarding an individual's interaction with a resource such as an interactive ad banner or game and indicate, for instance, what features of a game were played.  *See, e.g.,* '386 patent, col. 13, ll. 56-65.  The patent also makes possible, among other things, the collecting of data about the use of a resource, as well as data that may enable an association to be made between the use data and the client computer (or user computer) on which the use occurred.  *See, e.g.,* '155 patent, col. 5, ll. 1-7; '386 patent, col. 4, ll. 29-42.  For example, a database of information can be created using collected data that includes information about users who have visited a web site and includes information about such users' use of the site, such as what different pages on the site the user went to and in what order.  The information in the database can be analyzed to facilitate the determination of individual user interests and also regarding user preferences.  *See* '386 patent, col. 12, l. 61 – col. 13, l. 26.

## POINT II

## CLAIM CONSTRUCTION PROCEEDINGS

### A.    Legal Standards for Claim Construction

The basic standards for construing patent claims are well known.  The Court determines the meaning of pertinent claim language to establish the scope of the patent's claims for purposes of determining questions of infringement and validity.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978-79 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  In *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit reaffirmed and clarified the basic rules of claim construction.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art "as of the effective filing date of the patent application."  *Phillips,* 415 F.3d at 1312-13.  *See also Blount Inc. v. Trilink Saw Chain, LLC*, No. 06-CV-767-BR, 2007 WL 1725220, at *2 (D. Or. Jun. 8, 2007).  The person of skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.  *See also Blount*, 2007 WL 1725220, at *3.

Where the ordinary meaning of claim language is readily apparent, as it is here in the overwhelming number of claim elements, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips,* 415 F.3d at 1314.  In such a case, "general purpose dictionaries may be helpful."  *Id*.  Where the meaning of terms is not clear, courts may look to sources available to the public that will help determine how a person of skill in the art would understand the disputed claim language.  *Id*.

The Court should look to the claim language in which the disputed term appears, and may also consider other claims of the patent in question (whether asserted or not).  Similarities and

differences among claims may be instructive. *Phillips,* 415 F.3d at 1314-15. For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips,* 415 F.3d at 1315.

The claims should be read in view of and so as to be consistent with the specification of the patent. If the patentee provided a special definition for a term in the specification, that construction should govern. *Phillips,* 415 F.3d at 1316. However, as *Phillips* reiterated, courts must avoid reading limitations from the specification into the claims. *Phillips,* 415 F.3d at 1323; *Blount*, 2007 WL 1725220, at *5 (declining to import limitations from specification). *See also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007); *Columbia Sportswear North America, Inc. v. Cerf Bros. Bag Co.*, No. CV 05-1960-PK, 2007 WL 1792304, at *9 (D. Or. Jun. 19, 2007) ("Without more, an embodiment disclosed in the specification may not limit the claims.") (internal citations omitted). Although a specification often describes very specific embodiments of the invention, or only one embodiment, claims are not to be construed as being limited to the described embodiments. *Phillips,* 415 F.3d at 1323.

The Court may also consider the prosecution history of the patent, if in evidence, which it is here. Still, because the prosecution history reflects an "ongoing negotiation" between the applicant and the patent office, the prosecution history is often "less useful for claim construction purposes." *Phillips* at 1317; *Acumed*, 483 F.3d at 809.

The Court may also consider extrinsic evidence (all evidence other than the patent and prosecution history) but such evidence is less significant in determining the meaning of claims and should be considered in view of the intrinsic evidence. *Phillips,* 415 F.3d at 1317-18; *Blount*, 2007 WL 1725220, at *3.

**B.      Claim Construction Proceedings In The Present Case**

Claim construction proceedings are generally directed toward assisting the Court in determining the correct claim constructions, through focusing issues in need of resolution and identifying pertinent evidence.  In the main, courts do not construe claim terms for which there is no genuine need for construction (for example, when the claim language is clear and readily understood on its face).  NetRatings believes that many of the terms the Court in this case is being asked to construe are in fact clear and do not require construction.  Thus, NetRatings only identified 8 terms from the five asserted patents that it believed required construction, plus the 16 means-plus-function elements from the selected claims it was asserting.  *See* Ostrow Decl. Ex. I. WebTrends, on the other hand, identified approximately *55 terms* that it contends require construction, in addition to the 16 means plus function elements.  *See* Ostrow Decl. Ex. J.

Furthermore, as explained above, it is well settled that claim construction is a matter of law for the Court, and that claims are to be construed objectively with foremost reliance on the intrinsic evidence.  Claims of a patent are not to be construed simply to facilitate a particular defendant's effort to create a non-infringement position.  After having proposed a large number of terms to be construed, WebTrends then proffered two separate sets of constructions for the same terms.  WebTrends' initial identification of constructions on April 23, 2007 was supplanted by a significantly different set of constructions on August 24, 2007.  *See* Ostrow Decl. Exs. K and L, respectively.  Further, WebTrends' counsel, responsible for presenting the two sets of constructions in this case, previously represented another defendant in another case involving the asserted patents,[8] and there proposed still different constructions from the ones proffered now, and again for many of the very same terms.  *See* Ostrow Decl. Ex. M.  *See also* Ostrow Decl. Ex.

_____

[8] Case captioned *NetRatings, Inc. v. Sane Solutions, LLC*; 05-5076 (LTS) (AJP) (S.D.N.Y.).

BB (a claim chart containing each of three sets of constructions proposed by WebTrends'
counsel). Finally, several other defendants in other cases involving the asserted patents
(defendants with whom WebTrends is coordinating) also proposed constructions for some of the
same terms WebTrends identified, and those proposed constructions also differ from
WebTrends' constructions, often by not requiring many of the limitations WebTrends would
add.[9] If WebTrends were following the Federal Circuit's mandate of construing the patents
using the intrinsic evidence, which has not changed, it is hard to conceive of how WebTrends
and its counsel's proposed constructions could undergo such radical shifts.

In the following discussion of the particular claim elements, NetRatings illustrates how
the claim terms at issue should be interpreted through a proper application of well settled claim
construction principles.

---

[9] By way of example, whereas WebTrends seeks this Court to construe the claim term "installed in user
computer machines" as requiring, among other things "permanent placing by a user on a hard drive or
other permanent storage … until uninstalled by a user," another defendant, Zango, Inc., proposed that it
means "placed on the user's computer, and ready for use by that computer." *See* Ostrow Decl. Ex. N,
Joint Claim Construction Chart submitted on Apr. 27, 2007 by the parties in the litigation captioned
*NetRatings, Inc. v. 180solutions, Inc. and Zango Inc.*, Case No.:06-cv-3353 (BSJ) (HP) (S.D.N.Y.).
Similarly, whereas WebTrends proposed a construction for "local computer use meter" of a "stand-alone
computer program, that is capable of measuring the usage of any other application programs . . . by
intercepting the message traffic of those other programs," defendant Zango, Inc. has proposed that it
means "a software program that collects information regarding the use of a personal computer." *Id.* Many
similar examples may be provided illustrating that WebTrends is attempting to inject limitation and
details into its constructions that even the other defendants do not think belong there.

**POINT III**

**NETRATINGS' PROPOSED CONSTRUCTIONS**

A.      **Terms From the '510 and '680 Patents**

1.      *local computer use meter/user meter* (*CCC at row 1*) [10]

Consistent with the manner in which this term is used in the patents, a "local computer use meter" and a "user meter" should be defined as "a software program designed to collect information regarding the use of other software programs on a computer on which the software program is installed."  The intrinsic evidence clearly indicates that the 'meter' is software (*e.g.,* a software application).  *See, e.g.,* '510 patent, col. 2, ll. 21-22, 36-38; '680 patent, col. 2, ll. 28-30, 42-44 (referring to a "meter application").[11]  *See also* Ostrow Decl. Ex. O, at A00393 ('510 Patent, Response Under 37 C.F.R. §1.111 dated Dec. 26, 1996, at 3) (explaining that a "computer use meter in the form of a software module is installed on personal computers").  This intrinsic evidence, along with the use of the term "local," further indicates that the meter is designed to collect information regarding the use of software on a computer on which the software is installed.  *See, e.g.,* '510 patent, col. 1, ll. 36-38; col. 2, ll. 21-23, '680 patent, col. 1, ll. 44-46; col. 2, ll. 28-30 ("object of the invention to facilitate . . . collection of reliable information regarding the use of personal computer software;" "meter application installed in a personal computer may log events for top-level Windows for any given application").  *See also* '510 patent, col. 5, ll. 6-8; '680 patent, col. 5, ll. 44-46 ("system is provided to collect, process and deliver information regarding use of personal computer resources").

---

[10] References to the Claim Construction Chart follow the form: (CCC at row ___).  Row references are to the numbered rows in the Claim Construction Chart.

[11]  The patents repeatedly refer to applications and programs as software types.  *See, e.g.,* '510 patent, col. 1, ll. 57-64 (different applications tracked), col. 2, ll. 5-6 (executable programs identified), col. 3, ll. 6-16 (meter software upgraded), col. 3, ll. 44-47 (use of "software product or application program" recorded).

As will be seen with many of WebTrends' proposed constructions, WebTrends adds multiple limitations to the claims that are not supported by the intrinsic evidence, or are simply an embodiment that WebTrends is attempting to use to improperly limit the claims.

For instance, WebTrends adds a requirement that the meter be *"stand-alone,"* but this is a term which never even appears in the specification, literally or conceptually, and does nothing but inject ambiguity where there otherwise is none.  CCC at row 1.  Similarly, WebTrends adds a requirement that the meter measure use of *"any"* other applications thereby improperly incorporating an absolute concept into the term that is not present in the specification or the claims.  WebTrends also adds a requirement that the meter log data *"by intercepting the message traffic of"* other programs.  CCC at row 1.  Yet, this is just one description in the specification, and further only relates to *how* the meter works, not *what* it is.  Moreover, "intercepting" and "messages" are terms and concepts which are specifically contemplated and used in other independent and dependent claims.  *See, e.g.,* '510 patent claims 7, 10 and 18.  Principles of claim differentiation preclude reading such language into a claim where it does not appear, when the same language is explicitly used elsewhere in the claims.  *See, e.g., Phillips*, 415 at 1315.

For the foregoing reasons, WebTrends' construction should be rejected and NetRatings' construction adopted as the order of the Court.

### 2.      *installed in user computer machines* *(CCC at row 2)*

The meter application of the '510 and '680 patents is "installed in user computer machines."  *See* '510 patent, claim 1; '680 patent, claims 1, 12.  *See also* '510 patent, col. 2, ll. 21-23; '680 patent, col. 2, ll. 28-30 (meter application is "installed in a personal computer").  What this means is that the meter is "placed on and ready for use by a user computer."  The purpose of installing the meter on client computers is to permit the meter to run on the <u>client</u>

computer and collect data about locally occurring events, as opposed to being installed on server computers. *See supra* pp. 7-9.

WebTrends again improperly inserts limitations into this term by introducing who, how and where concepts into its construction. CCC at row 2. For instance, WebTrends' construction requires that a "user" must perform the installation. Yet nothing in the claims (or the specification) requires that the meter be installed by a specific someone or something (*e.g.,* a person or a computer). To the contrary, the specification clearly contemplates, in some embodiments, the use of "***automated*** installation and data transfer programs" through which the system can "maintain as passive a profile as possible" and which "reduce impact on any particular user." '510 patent, Col. 4, ll. 55-63. *See also* '510 patent, Col. 3, ll. 13-15 (software upgrades to the data transfer program may automatically be transferred to the panelist's computer). Moreover, the patents state that "[a]fter an initial installation process, the system may be completely passive . . . the computer user does not have to take any additional action for the system to operate effectively." '510 patent, col. 3, ll. 41-44; '680 patent, col. 4, ll. 7-10. This language in the patent makes clear that: (1) there may be user action involved in installation, (2) there may not be, and (3) the user action may or may not have any direct relation to the installation process. In requiring user action, WebTrends' construction excludes explicit embodiments of the patents, and adopting such a construction would be error. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1374 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment... is 'rarely, if ever, correct.'") (internal quotations omitted).

Similar to its "user" limitation, WebTrends contends that installation must be "permanent" but this is simply another extreme that WebTrends is attempting to use to impermissibly limit a word that normally encompasses a range of configurations. In fact, an

installation could be permanent or not permanent, as WebTrends' own construction makes clear by reciting that the meter should be "permanently placed . . . until uninstalled by a user." If the meter can be uninstalled, clearly it is not permanent.[12]

WebTrends also adds a specific "where" aspect to its construction, requiring that the meter be installed in "a hard drive or other permanent storage of a personal computer." However, the claim already dictates the *where* -- "installed in user computer machines" -- and not "installed *in the hard drive or permanent storage of* user computer machines" as WebTrends proposes. *See Phillips,* 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"). Further, WebTrends' own construction shows that it is adding qualifications to terms which otherwise do not have any. That is, by specifying two locations within a personal computer where the meter can be installed, WebTrends is clearly acknowledging that there are other possible locations within the computer.[13]

In short, while WebTrends' proposed construction adds improper limitations and qualifications, NetRatings' definition is based on the intrinsic evidence, starting with the claims themselves, and is supported fully by the ordinary meaning of the word "install," which focuses

---

[12] WebTrends' construction is also unhelpful in simply using the word it purports to define in the definition itself ("uninstalled" in its construction of "installed"). If WebTrends believes the jury will understand what uninstalled means, they should also understand what installed means and therefore no construction is needed.

[13] Computers have different memory and storage devices, among other things, and WebTrends just arbitrarily limits the claim. *See, e.g.,* Ostrow Decl. Ex. P, *IBM Dictionary of Computing* (George McDaniel ed., 10th Ed. 1993) ("*IBM*") at 10 (defining personal computer as "(2) A desk-top, floor-standing, or portable microcomputer that usually consists of a system unit, a display monitor, a keyboard, one or more diskette drives, internal fixed-disk storage, and an optional printer."). *See also* Ostrow Decl. Ex. Q, *Webopedia Computer Dictionary* at http://www.webopedia.com/TERM/C/computer.html ("[a]ll general-purpose computers require the following hardware components: memory: Enables a computer to store, at least temporarily, data and programs; mass storage: Allows a computer to permanently retain large amounts of data. Common mass storage devices include disk drives and tape drives; input device: Usually keyboard and mouse, the input device is the conduit through which data and instructions enter a computer; output device: A display screen, printer, or other device that lets you see what the computer has accomplished; central processing unit (CPU): The heart of the computer, this is the component that actually executes instructions.").

on something being set in place and made ready for use.[14]  Accordingly, NetRatings'
construction should be adopted by the Court.

**3.**      ***log of predetermined [machine operation] events** (CCC at row 3);[15] **log** (CCC at row 3); **events** (CCC at row 4); **machine operation events** (CCC at row 5); **logging predetermined events by a plurality of local computer use meters** (CCC at row 6)*

As described in the specifications, the meters record data regarding events relating to the
use of personal computer software and on-line services, for example.  *See, e.g.,* '510 patent, col.
1, ll. 36-44.  The types of events for which data is collected are selected in advance to facilitate
the collection – in other words, the software meter is programmed to collect data on selected
events, *if and when they occur*, in which case it operates to collect that type of data.  In
accordance with the intrinsic evidence, as well as the plain meaning, the term "log of
predetermined [machine operation] events" should be defined as "a record of data regarding the
occurrence of pre-selected potential events [related to machine operations]."

Data regarding events that may be recorded include, for example, "message types such as
launch, terminate, switch, minimize, restore," and "date, time, household ID number, individual
within the household using the computer," among others.  '510 patent, col. 2, ll. 1-7, 28-33; '680
patent, col. 2, ll. 9-15, 35-40.  *See also* Ostrow Decl. Ex. O, at A00393 ('510 Patent, Response
Under 37 C.F.R. §1.111 dated Dec. 26, 1996, at 3 (explaining that "the computer use meter
captures and identifies any world wide web pages which are being used by the user").

---

[14] *See* Ostrow Decl. Ex. R, *The Merriam-Webster Dictionary* (1997) ("*MW*") at 5 [install] (to set up for use or service); Ostrow Decl. Ex. S, *Webster's II New College Dictionary* (1995) ("*Webster's II*") at 4 [install] (to set in position or adjust for use).  *See also* Ostrow Decl. Ex. T, *McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th Ed. 1994) ("*McGraw-Hill*") at 4 (installation: "procedures for setting up equipment for use or service"); *IBM* at 6 [install] ("(1) to add a program, program option, or software to a system in such a manner that it is runnable and interacts properly with all affected programs in the system.").

[15]  The phrase "log of predetermined machine operation events" appears in claim 1 of the '510 patent.  The phrase "log of predetermined events" (without being limited to *machine operation* events) appears in claims 1, 4, 10-12, 15, 21 and 22 of the '680 patent.

NetRatings' proposed definition is fully in accord with the intrinsic evidence and ordinary meaning of the words "log" (a record) and "predetermined" (decide/determine beforehand).  *See, e.g.,* '680 patent, col. 2, ll. 28-56; col. 4, ll. 6-31; col. 5, ll. 24-32; Fig 1.  *See also McGraw-Hill* at 5 (multiple definitions in different contexts, all a "record" of various items); *MW* at 5 ("regularly kept record"); *Webster's II* at 5 (a "record" of "events"); *Webster's II* at 7 [predetermine]; *MW* at 8 [predetermine].  Events in the context of the patents and based on the ordinary meaning should be construed as "occurrences or actions detectable by a computer."  *See, e.g.,* Ostrow Decl. Ex. U, *Microsoft Press Computer Dictionary* (3rd Ed. 1997) ("*Microsoft*") at 5 [event] ; *IBM* at 5 [event].  *See also* '510 patent, col. 2, ll. 1-7, 22-33; '680 patent, col. 2, ll. 9-15, 28-40.  Machine operation events are "events relating to operations performed on the computer."

WebTrends also chose to construe the related term "logging predetermined events by a plurality of local computer use meters."  Properly construed, this term means "two or more local computer use meters recording data regarding the occurrence of pre-selected potential events." This construction is fully supported by the specification and the ordinary meaning of the terms in the phrase.  Events and logs are discussed above.  With respect to a "plurality of local computer use meters," a plurality is construed as "two or more."  Ostrow Decl. Ex. V, Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* § 20 (Practising Law Institute, Third Edition 1990) (noting that a "plurality" is "used for an indefinite number, two or more").

WebTrends' constructions for the foregoing terms indicates a calculated effort to build narrowing limitations into each, even though there is no support for such limitations.  For instance, with respect to "log," WebTrends' construction requires that the log be "a file" which contains "multiple records of events occurring over a period of time."  CCC at row 3.  While there are examples in the specification of logs which indicate multiple events over time, such examples

should not be imported into the claim language in order to limit it. *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002) (accused infringer cannot "narrow a claim term []…simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"). Further, while the patents sometimes refer to a log file, they also refer to the log generally, and an event log. There is no limitation in the specification that the log must always be a "file" and the specification repeatedly refers to the log without use of the word "file." *See, e.g.,* '510 patent, col. 2, l. 54 (referring to the "data log" and a "log" with no qualifier); col. 2, ll. 58 and 59 (referring to an "event log"); col. 2, l. 64 (referring to "local personal computer use logs").

WebTrends also proposes that the log must contain multiple records of events. There is no such requirement. Rather, this is just one embodiment and cannot be used to limit the claims. *See CCS Fitness,* 288 F.3d at 1366; *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001). WebTrends' proposed constructions also violate principles of claim differentiation. For instance, WebTrends proposes the same construction for the different terms "events" and "machine operation events."

Further, WebTrends' construction for these terms ("messages generated by an operating system in response to user actions…") appears to be an attempt at importing limitations from embodiments in the specification into the claims. The "events" of the patents, like events in the computer context generally, do not need to be "messages," do not need to be "generated by an operating system," and do not need to be "in response to user actions." In fact, the examples of events listed in the patents do not all have these characteristics (*e.g.,* they include that the meter started or stopped). *See* '510 patent, col. 8, ll. 16-30. In addition, the specification's description of the interception of operating system messages is as a way to know that events have occurred,

not as the events themselves -- the events are the *occurrences*, not the *messages*.  Indeed, other

claims, such as claim 10 of the '510 patent, distinguish between operating system messages and

the event log "responsive to selected operating system messages."  This claim language clearly

differentiates between *events* and the operating system *messages* to which they relate.  As stated

by the Federal Circuit, "[w]hen different words or phrases are used in separate claims, a difference

in meaning is presumed."  *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).

For the foregoing reasons, NetRatings' constructions should be adopted by the Court.

    **4.**      ***stored in memory of said computer machines*** *(CCC at row 7)*; ***stored in an associated user computer machine*** *(CCC at row 8)*; ***storing each of the events in said log in the local computer memory of said user computer systems*** *(CCC at row 9)*; ***storing said log of predetermined events by each use meter in an associated user computer machine*** *(CCC at row 10)*

With respect to "stored in memory of said computer machines," ('510 patent) and "stored

in an associated user computer machine" ('680 patent), each of these terms refer to the storing of

the log of each patent.  *See* '510 patent, claim 1; '680 patent, claim 1.  The terms are readily

understood upon reading the claim language and should be construed as "placed in memory of

the user computer on which the local computer use meter is installed" and "placing each of the

events in the log in memory of the user computer on which the local computer use meter is

installed," respectively.  Other than in the manner that the claim language itself describes details

of the storage, the terms should not be limited to storing in a particular location.  Similar to the

discussion above regarding where the meter is installed, the claims do not limit storage to a

particular type of memory device or location with respect to these terms, and there are other

possibilities beyond permanent memory or hard drives.[16]  For example, "memory" may include

---

[16]  *See e.g.,* '510 patent, col. 1, ll. 65 - 67 (describing that messages may be recorded in a log file and not limiting the type of memory or memory device used to record the messages); '510 patent, col. 3, ll. 44 - 47 (describing that the use of software applications may trigger event messages in the operating system that may be recorded though not limiting the recording to a type of memory); '510 patent, col. 4, ll. 18 -

both volatile memory (memory that does not persist in the absence of power) and nonvolatile/permanent memory (memory that persists despite a lack of power), as both are capable of providing for the storage and retrieval of data.  *See IBM* at 9 [permanent memory], *Microsoft* at 7-8 [permanent storage]; *McGraw-Hill* at 8 [volatile memory], 6 [nonvolatile memory].  Thus, WebTrends' construction of these terms is erroneous in requiring that the log be "written to" the "hard drive or other permanent storage of the user computer machine."

With respect to the terms "storing each of the events in said log in the local computer memory of said user computer systems" ('510 patent) and "storing said log of predetermined events by each use meter in an associated user computer machine" ('680 patent), the proper constructions of such terms are "placing each of the events in the log in memory of the user computer on which the local computer use meter is installed" and "placing the log of predetermined events logged by each use meter in the user computer," respectively.  These constructions account for the full meaning intended in the patents with respect to where storing occurs.  WebTrends' constructions of these terms again inappropriately restricts the claims, this time by essentially adding an entire additional element into the claim which is not there.  That is, WebTrends' posits that the logs have been stored in one location on the computer prior to the storing step.  The claims simply do not contain this extra step.  Nor do the claims specify, much less require, the additional limitation WebTrends' construction includes,  that the log be "stored" in a location which is different from the location where it was "created."  CCC at row 10.  Such an approach to claim construction is entirely inappropriate and should be rejected.

---

19 (describing the recordation of titles of windows and not limiting the recordation to a type of memory); '680 patent, col. 3, ll. 51 - 57 (describing storing information input by a user and not limiting the type of memory or memory device used to store the information); '680 patent, col. 4, ll. 51 - 53 (describing recording titles of windows and not limiting the type of memory or memory device used to store the recorded titles); '680 patent, col. 8, l. 24 - 28 (describing the format used by the log file to store data and not limiting the type of memory or memory device used to store the data).

**5.**   *identify titles of open windows and reflects a log of titles of worldwide web pages* (CCC at row 11)*; identify titles of windows and world wide web pages* (CCC at row 12)

NetRatings does not believe any construction of these terms is required, and WebTrends' proposed erroneous constructions should be rejected. Notwithstanding that these terms are almost identical, WebTrends has now posited very different constructions for each. With respect to the phrase "identify titles of open windows and reflects a log of titles of worldwide web pages," in WebTrends' most recent iteration of its construction for the term, WebTrends simply replaces:

*identify titles of open windows and reflects a log of titles of worldwide web pages*

with

*contains the titles, as displayed in the title bar, of at least two open windows and of at least two world-wide web pages.*

In other words, the primary difference between WebTrends' construction and the claim language is WebTrends' insertion of the wholly extraneous phrase: "as displayed in the title bar." For reasons unknown, WebTrends did not make a corresponding change to its construction of the second term, "identify titles of windows and world wide web pages." Instead, WebTrends proposes that this phrase means:

"contains (1) the full displayed titles of at least two open windows that were displayed on the user computer system, as those titles appeared in the window's title bar, and (2) the information contained in the HTML <TITLE> tag of at least two world wide web pages."

CCC at row 12.

Neither of WebTrends' proposed constructions for these terms is correct. Among other errors is the requirement that the titles must be exactly what is "displayed in the title bar." No such requirement can be found in the intrinsic evidence. Moreover, if the terms mean only this, then at least one objective of the invention, as described in the specification and file history

26

references above, would be frustrated. *See, e.g.,* '510 patent, col. 4, ll. 20-46. This objective is to obtain information that is useful in describing what a user is doing on the computer and this may or may not be possible using what is in the title bar. Consider for example how the text of a title bar can vary depending on the owner of a particular computer or web page. Any text may be placed there using an HTML tag in the HTML document which renders the web page, for instance. This could be more than needed to provide a useful description of a window or web page, or less (either in terms of insufficient characters or characters which are not in fact descriptive of what the page is).

The absence of any basis for the limitations WebTrends' constructions impose on these straightforward terms compels their rejection. Further, WebTrends' use of virtually all of the words from the claim terms in its constructions confirms that no construction is actually required. Still, should the Court conclude that some construction would be desirable, NetRatings has proposed that the first term, "identify titles of open windows and reflects a log of titles of worldwide web pages" and the second term, "identify titles of windows and world wide web pages" be construed as "contains characters identifying open windows and reflects a record of characters useful in identifying world wide web pages" and "contain characters identifying windows and world wide web pages," respectively. These constructions are consistent with the intrinsic evidence, which is in accord with the ordinary meaning of the words in the phrases. For the word "titles," NetRatings' construction relies on the patent and the descriptions of the function of the titles therein, which is to know, for example, what web pages users access by identifying those pages in some manner. *See, e.g.,* '510 patent, col. 4, ll. 11-63 ("[w]indow titles" of applications "generally hold useful descriptions of the activity at that moment"). *See also* Ostrow Decl. Ex. O, at A00393 ('510 Patent, Response Under 37 C.F.R. §1.111 dated Dec.

26, 1996, at 3 (the object of the logging of titles is to *identify what the user is doing on the computer* by identifying, *for example*, "any world wide web pages which are being used by the user")) (emphasis supplied).[17]

For the reasons set forth herein, no construction is believed to be necessary for these terms. In the event the Court believes construction is warranted, NetRatings' constructions should be adopted by the Court.

**6.      *dictionary/dictionary file* (CCC at row 13)**

The "dictionary" of the '510 patent is described in one embodiment as a collection of data which is used to interpret data collected by the meter for reporting purposes. *See* '510 patent, col. 5, l. 64 - col. 6, l. 3. The appropriate construction of "dictionary" in the context of the patent is "a database or file containing entries used to interpret or correlate data." NetRatings' construction is fully supported by the patent specification, file history and the ordinary meaning of the word in the computer science context, and is helpful to clarify the meaning of the term in this context as distinct from the traditional meaning, in other contexts, of a book of definitions. *See, e.g.,* '510 patent, col. 5, ll. 27-40 (dictionary is provided to "interpret" data from logs); Fig. 1 (dictionary shown as a database); Ostrow Decl. Ex. O, at A00394 ('510 Patent, Response Under 37 C.F.R. §1.111 dated Dec. 26, 1996, at 4 (dictionary assists in "interpretation of the event logs"). *See also* Ostrow Decl. Ex. W, *The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Christopher J. Booth ed., 5th Ed. 1993) ("*IEEE*") at 6 (dictionary defined as a "list of data items and information about those items, used both to describe and to reference the items").

---

[17] NetRatings' constructions are also supported by the ordinary meaning of the word title as reflected in standard dictionaries. *See, e.g., MW* at 11 (a "distinguishing name"); *Webster's II* at 10 ("an identifying name" or a "general or descriptive heading").

There are several flaws with WebTrends' construction of the term dictionary.  In the first instance, WebTrends requires that the dictionary be a "file" but to adopt this construction would read claim language out of the claims.  Claim 11 of the '510 patent specifies a "dictionary," whereas claim 9 of the '510 patent specifies a "dictionary file."  In other words, to say that the dictionary must always be a file would eliminate a distinction written into the claims.  *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous").  In addition, WebTrends' construction includes a requirement that the data interpreted be "raw."  This simply inserts a characterization of the data that is not in the claims.

Accordingly, WebTrends' construction of "dictionary" should be rejected and NetRatings' construction adopted by the Court.

### 7.    *correlates said titles to identifiable labels (CCC at row 14)*

One function of the claimed dictionary of the '510 patent is that it "correlates said titles to identifiable labels."  '510 patent, claim 11.  WebTrends incorrectly contends that the term is indefinite.  CCC at row 14.  To the contrary, the term is easily understood by one of ordinary skill in the art based on its common, ordinary meaning.  Though construction is unnecessary, the term may be phrased, as NetRatings proposes, as "correlates titles to labels identifiable for reporting."  This construction relays the ordinary meaning as well as one of the objectives of the '510 patent with respect to this term, and finds full support in the patent specification.  *See* '510 patent, col. 5, ll. 6-8 ("system is provided to collect, process and deliver information regarding use of personal computer resources"); col. 5, ll. 53-56 ("system may generate reports showing information derived from the data base elements maintained," many of which elements are

described in the column reference indicated).  *See also* '510 patent, Fig. 1 (wherein "identified usage data" is specified at 15 in the Figure and at col. 5, l. 45).

The specification of the '510 Patent describes several examples of "identifiable labels", such as the label "S" which "identifies the file size of an application"; the label "T", which "identifies the Windows title of the application"; and the label "D", which "identifies miscellaneous data, typically the full path of the application."  '510 patent, col. 9, ll. 41-45.  The specification notes that "[o]ther labels and information could also be logged."  *Id.*

As shown here, the term "correlates said titles to identifiable labels" is not indefinite, being described with reference to the claims and specification of the '510 patent and NetRatings' construction of the term should be adopted by the Court.

8. ***generating a log of machine operation events in each of a plurality of user computer systems*** *(CCC at row 15)*

NetRatings' proposed construction of the above term is "generating a log of machine operation events in each user computer system of a group of more than one user computer systems."  This is supported by the ordinary meaning of the words in the term and in accord with standard patent terminology: a <u>plurality</u> of user computer systems means <u>more than one</u> user computer system.  *See* Ostrow Decl. Ex. V.

9. ***transferring said stored events from said plurality of user computer systems to a processing station computer*** *(CCC at row 16)*

The parties' disagreement with respect to the foregoing term is simple -- WebTrends' proposed construction incorrectly construes "said stored events" as meaning "the multiple records of events contained in the log."  *CCC at row 16.*  However, the language of the claim is clear that what is transferred is the stored events.  Whether the events are in the form of multiple records from a log or otherwise is not specified in the claim, and there is no reason to add such a

limitation.[18]  Accordingly, this term appears to be one that requires no construction or, if some

clarification is deemed necessary, NetRatings' proposed construction should be adopted.

10.    ***wherein said log of predetermined events identifies character strings reflecting on-line activity*** *(CCC at row 17)*

WebTrends asserts that this term, which appears in claim 12 of the '680 patent, is

indefinite because there is no antecedent basis for "said log of predetermined events." CCC at

row 17.  However, this term appears in the step of "logging predetermined events…" which

creates the antecedent basis.  A lack of explicit antecedent basis does not render a claim

indefinite where the "antecedent basis [is] present by implication" or "[i]f the scope of a claim

would be reasonably ascertainable by those skilled in the art."  *Energizer Holdings, Inc. v.*

*International Trade Commission*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).  *See also Bose*

*Corporation v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) ( "[t]he prior recitation of 'an

ellipse'…provides the antecedent basis for 'an ellipse having a major diameter,'" as "an inherent

characteristic of an ellipse is a major diameter.").  The Manual of Patent Examining Procedure

notes that "[i]nherent components of elements recited have antecedent basis in the recitation of

the components themselves."  Ostrow Decl. Ex. X, *Manual of Patent Examining Procedure* §

2173.05(e) (Thomson/West 8th ed. 2006).  These principles clearly apply here - the act of logging

or recording predetermined events results, inherently or by implication, in generation of a log or

record, and one of ordinary skill in the art would have no trouble ascertaining that meaning of the

claim.  WebTrends is therefore wrong.

---

[18]  It is possible that WebTrends' contention is premised on the fact that the next step of the claim specifies "loading said event logs into memory associated with said processing station computer."  '510 patent, claim 11 (at col. 11, ll. 3-4).  However, that event logs are loaded into memory at the processing station does not necessitate that the processing station receives events as logs, or only as logs.  In an embodiment, the events could be received and then logs created or recreated for loading.

**B.      Terms From the '155 and '386 Patents**

    **1.      *executable program*** *(CCC at row 19)*

The term "executable program" means a "program that can be run on a computer."  This construction is consistent with the patent and with the ordinary meaning of the term.  *See, e.g.,* '155 patent, col. 5, ll. 27-48 (executable program "runs" on clients or servers).  *See also Microsoft* at 6 (executable program is a "program that can be run").  WebTrends' proposed construction is "a set of machine language instructions that constitute the output from the compilation of a source program."   First, it is inconceivable how this construction would assist any trier of fact in understanding the claim term.  Moreover, even if the jury were able to make sense of the proposed construction, there is simply no basis for it.  Nothing in the specification discusses, much less requires, any step of compiling programs or the need or desirability therefore, or for using only compiled languages.  Accordingly, such construction must be rejected and NetRatings' construction adopted by the Court.

    **2.      *tracking program*** *(CCC at row 20)*

The claims of the '386 patent specify a "tracking program" used to monitor user interaction with resources.  The "tracking program" is properly construed as "computer readable code that monitors use of a computer."  This construction is supported by the patent and by the ordinary meaning of what a program is.[19]  *See, e.g.*, '386 patent, col. 8, ll. 23-31 (the "tracking program" "monitor[s] various indicia, such as time, mouse events, keyboard events . . . details of choices (such as links) made by individual users within a particular Web page").

---

[19]  *See, e.g., IBM* at 4 ("computer program A sequence of instructions suitable for processing by a computer."); *IEEE* at 4-5 ("computer program . . . (3) (software). A sequence of instructions suitable for processing by a computer."); *McGraw-Hill* at 7 (program: "[COMPUT SCI] A detailed and explicit set of directions for accomplishing some purpose, the set being expressed in some language suitable for input to a computer, or in machine language."); *Microsoft* at 4 (computer program: "A set of instructions in some computer language intended to be executed on a computer so as to perform some task.").

WebTrends seeks to limit a tracking program to a "timer program that calculates the amount of time that a user uses a resource."  Aside from the fact that nothing in the claims requires that the tracking program be able to calculate time, there are other reasons it cannot be the proper construction of the term.  Specifically, the specification describes a tracking program that monitors time as an exemplary embodiment, not a mandatory one.  *See, e.g.,* '386 patent, col. 8, ll. 23-30 (tracking program "may" monitor various indicia such as time).  Further, the parent patent to the '386 patent, U.S. Patent No. 5,796,952 ("the '952 patent"), explicitly claims a "software timer." Ostrow Decl. Ex. Y, '952 patent, col. 19, ll. 18-21.  Claim differentiation therefore requires that a tracking program be construed to be something other than a "timer" program.  *See Karlin Technology Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999) ("the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.").

3.    ***the tracking program is embedded in the Web page ('386 patent)*** *(CCC at row 21);* ***executable program not being part of the resource ('155 patent)*** *(CCC at row 22)*

The tracking program of the '386 patent may, but does not have to be, "embedded" in a resource.  What that means, as is clearly described in the patent, is that the tracking program may be "contained within or incorporated by reference" into the web page.  *See, e.g.,* '386 patent, col. 3, ll. 42-55; col. 5, ll. 22-41; col. 8, ll. 49-63.  This reflects that the patent is using the term "embedded" in both the normal every-day sense of being "contained within" but is also using the term to refer to the situation where the program is not included in the text of the web page, but is downloaded through a link in the web page.  For example, the specification describes that a tracking program may be "embedded in a file which is downloaded from a server to a client.  The tracking program need not originate from the same server that sent the file, and may be obtained, for example, via an embedded URL that points to a different server."  '386 patent, col. 4, ll. 47-52.

33

As described here, the tracking program is not contained within the web page, but is still considered "embedded" in it where it is obtained by a link (and thus incorporated by reference).[20] WebTrends manages to complicate even this simple term by proffering a construction that limits the term to the situation where the web page "contains a reference identifying the location of the tracking program" and "specifying parameters for the tracking program." CCC at row 21. However, there is no support for these narrowing limitations and therefore they must be rejected.

A conceptually related term is "executable program not being part of the resource." This means "executable program not contained within the resource." As explained with respect to "embedded" above, the patent clearly contemplates a program being embedded in a resource such as a web page, even though the program is not contained within the web page. That is, a program may instead be incorporated by reference, or "embedded" in the resource. In this way, the program is not part of the resource itself, but the resource contains a reference (link) to the program. *See, e.g.,* '155 patent, col. 8, ll. 13-59; col. 9, ll. 9-16; col. 10, ll. 27-67; col. 11, ll. 2-19. *See also* Ostrow Decl. Ex. Z, at A00968 ('952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), at 11 (program is "linked to an HTML document and is downloaded and executed on a client when the HTML document is served to the client")). WebTrends' proposed construction would preclude the embodiment where the program is not part of the resource, but there is a link to the program in the resource. As explained above, constructions which exclude preferred embodiments cannot be correct.

---

[20] *See also* '386 patent, col. 5, ll. 31-37 ("The HTML document [Web page] also contains a second embedded URL for pointing to a first executable program . . . the first executable program being embedded inside the HTML document using [a tag] to specify the source URL for the program") and Ostrow Decl. Ex. Z, at A00967 ('952 Patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), at 10 (where the "URL (i.e., the address) of a tracking program is embedded in a resource, such as a Web page," the tracking program is considered to be embedded in the resource)).

**4.**    ***monitor use of the resource**; **resource use data** (CCC at row 24); **monitoring input device events** (CCC at row 25); **monitoring details of choices made by a user of the first client using an input device of the first client** (CCC at row 26); **monitor interaction through the client computer with at least one of the first resource and one or more second resources** (CCC at row 27)*

NetRatings does not believe the foregoing terms require construction as they should be readily understood.  However, NetRatings provides proposed constructions in the event the Court believes some clarification would be helpful.

WebTrends' constructions should be rejected at least because they incorporate an "over time" concept which is unduly narrow.  WebTrends defines "monitor" as to "keep track, over a period of time."  While monitoring in the context of the patents certainly may include a time element, nothing in the claims, specification or file history calls for a construction of the word "monitor" which requires a time element.  *See, e.g,* '386 patent, col. 8, ll. 24 - 31 ("tracking program *may* simply monitor the amount of time the user spends interacting with the Web page, *or may* monitor details of choices (such as links) made by individual users within a particular Web page"); col. 8, ll. 24 - 31 ("tracking program *may* monitor the length of time the user remains in the Web page . . . and *may* track some or all mouse and keyboard events to provide meaningful data to the server concerning the user's interaction with the Web page").  *See also* '155 patent, col. 4, ll. 50-55; col. 8, ll. 19-22.

Thus, the '155 and '386 patents contemplate, consistent with the word's normal usage, that monitoring is of a variety of data types and in variety of ways.  NetRatings believes that the word "monitor" constitutes an apt term to capture this variety and therefore while NetRatings proffers a construction for the word "monitor" if the Court believes a definition would be helpful (specifically, "track, check, observe, detect or capture for a specific purpose"), no construction is

needed and that the word "monitor" itself should be used in the claim terms, and not its definitional replacement.[21]

     **5.**     ***client identifying indicia*** *(CCC at row 28)*

     The term "client identifying indicia" means "any information that can be used to associate data with a client." This construction follows the '155 patent's description. For example, the patent discusses one object of the invention as creating a database of details of user interaction with network resources. Such a database might include resource information, such as "IP address[es]"combined with client information, such as "client IDs" or "cookies." '155 patent, col. 4, ll. 29-37. Examples of client identifying indicia include "a user's network ID (IP) and client ID numbers (cookies)." '155 patent, col. 11, ll. 20-24. WebTrends' construction of this term as "information that uniquely identifies the client" (CCC at row 28) is incorrect at least because it adds the limitation that the information identify the client uniquely.

     **6.**     ***[comprises] data representative of a plurality of preferences of a user*** *(CCC at row 29)****; [comprises] data representative of a plurality of interests of a user*** *(CCC at row 30)*

     These are yet more claim phrases (which appear in claims 18 and 19 of the '155 patent, respectively) which NetRatings believes do not require construction and can be readily understood by a trier of fact. However, given WebTrends' ongoing attempt to narrow the claims wherever possible, NetRatings proposes constructions of the foregoing terms as: "information from which a user's preferences can be determined" and "information from which a user's interests can be determined," respectively. The '155 patent describes certain prior methods of collecting information regarding user preferences and/or interests whereby a user specifically enters his or her preferences and interests. In some embodiments of the invention of the '155

---

[21] NetRatings' construction is consistent with the patents, but also with the ordinary meaning of the word. *See MW* at 7 [monitor] ("to watch, check, or observe for a special purpose"); *Webster's II* at 6 [monitor] (definitions include "to check," "to track" or "to keep watch over").

patent, however, information regarding user preferences and/or interests is collected by monitoring, for example, the user's use of a resource. From the collected data, a user's preferences and/or interests may be determined. *See, e.g.,* '155 patent, col. 13, ll. 2-11 ("An analysis of the data on a user-indexed basis would facilitate the determination of individual user interests and the like. On the other hand, analysis of the data on a resource-indexed basis would allow the determination of, for example, which web pages are viewed the longest and/or most often either by users in general, or by specific users. Thus, it would be possible to determine if there were different types of users that preferred different sections of the web site (because, for example, they spent more time browsing different sections of the Web site).") *See also* '155 patent, col. 2, ll. 1-55; col. 12, l. 58 - col. 13, l. 24; col. 13, l. 62 - col. 14, l. 26; col. 14, l. 52 - col. 15, l. 10.

WebTrends' constructions attempt to narrow these otherwise easily understood claim elements by limiting the claim term "preferences" to, only and specifically, "settings specified by the user" and the claim term "interests" to, only and specifically, "subjects that a user is interested in learning about." To the extent WebTrends is able to extrapolate these limitations from examples in the specification, which is doubtful, such an exercise would again constitute an improper importation of embodiments from the specification to limit the claims.

 **7.**  ***storing the resource use data in the client computer*** *(CCC at row 31)*

NetRatings' construction of the foregoing term, which appears in claims 11 and 23 of the '386 patent, is: "placing the resource use data in memory or on a mass storage device of the client computer." This is consistent with the claim language itself, which simply requires that the resource use data be stored somewhere in the client computer such as a memory or mass storage device, and the '386 patent specification, which contemplates data being stored in both types of devices (*see, e.g.*, Fig. 2 and col. 7, ll. 40-59). As before with respect to the '510 and

37

'680 patents, WebTrends attempts to limit this term to meaning placing the information only "on a computer hard drive or other permanent storage device connected to the client computer." CCC at 31. Their construction is as incorrect here as it was before.

**8.**      ***server***  *(CCC at row 32)*

NetRatings does not believe a construction is required for this term, as it would be readily understood by a jury or other trier of fact and that the ordinary meaning should apply. The ordinary meaning of server is, generally, a "computer or device on a network that manages network resources."[22] WebTrends' proposed construction is incorrect at least in so far as it attempts to introduce another absolute, unnecessary limitation to the claim, *i.e.*, that the server be a "uniquely addressable computer system."

**9.**      ***downloading the tracking program from a second server of the one or more servers** (CCC at row 33)*; ***the first server and second server comprising two servers** (CCC at row 34)*

NetRatings' construction of the term "downloading the tracking program from a second server of the one or more servers" is "downloading the tracking program from a server other than the first server," which makes clear that the second server is not the first server. Similarly, NetRatings' construction of "the first server and second server comprising two servers" is "the first server is a different machine than the second server." It should be noted that, in both cases, the servers could be of the same type. WebTrends' constructions are problematic in that they require that the second server be "different from" or a "different server than" the first server,

---

[22] Ostrow Decl. Ex. Q, *Webopedia Computer Dictionary* at http://www.webopedia.com/TERM/s/server.html. *See also* Ostrow Decl. Ex. AA, *Merriam-Webster Online Dictionary* at http://www.merriamwebster.com/dictionary/server ("server 6: a computer in a network that is used to provide <u>services</u> (as access to files or shared peripherals or the routing of e-mail) to other computers in the network") (emphasis in original); *IBM* at 12 ("**server** (2) In a network, a data station that provides facilities to other stations;"); *Microsoft* at 10 ("**server** 2. On the Internet or other network, a computer or program that responds to commands from a client."); *Webster's II* at 9 ("**server** 5. *Computer Sci*. A computer that stores files and provides them to workstations connected to it.").

implying that the use of two identical machines would somehow not be covered by the claims. CCC at rows 33-34.

    **10.**     ***downloading of the first resource causes the downloading of the tracking program*** *(CCC at row 35)*

NetRatings does not believe a construction is required for this term and that the ordinary meaning should apply.  The concept of the downloading of the first resource being the cause of the downloading of the tracking program is one that a jury or other trier of fact should readily comprehend.  Indeed, juries are regularly asked to decide in various types of cases whether one event was the cause of another event.  Instead, WebTrends is once again attempting to use this as an excuse to introduce more limitations into the claims, *i.e.*, that the downloading of the first resource results in the client computer being "instructed to issue a further request to download the tracking program."  Although this is one way in which the downloading of the first resource can cause the downloading of the tracking program, it is an embodiment and does not provide a basis for limiting claims which are, by their own clear language, not so limited.

    **11.**     ***the one or more second resources having been obtained by the first client from a server of the one or more servers as a result of interaction through the first client with at least one of the first resource and a second resource of the one or more second resources*** *(CCC at row 36)*

WebTrends requests construction of this long phrase from the claims, which NetRatings believes is readily understandable and requires no construction.  To the extent any construction might be helpful, it is only to clarify that the end of the phrase -- "with at least one of the first resource and a second resource of the one or more resources" -- means "with the first resource or a different second resource."  This construction is justified by the claim language itself, which should be read as "with at least one of [A] the first resource and [B] a second resource of the one

or more second resources," where the claim is specifying at least one of item [A] or item [B].[23]
The claim language further requires that second resource is different than the second resource(s)
being monitored, since the second resource(s) being monitored are, per the claim, obtained as a
result of interaction with such different second resource. WebTrends' proposed construction is
incorrect at least because it eliminates item [B] as an option and requires only that the second
resource be obtained as a result of the "downloading of, or interaction with, the first resource."
CCC at row 36.[24]

     WebTrends' proposed construction of this term is wrong for a number of additional
reasons. These include that it requires that this provision must apply to "*any* second resource" as
opposed to just the second resource being monitored in the claim, and that it allows for this
second resource to have been obtained though the "downloading of" the first resource, whereas
the claim clearly requires that it be obtained through *interaction with* the first resource (or a
different second resource as explained above). WebTrends' proposed construction should be
rejected.

     **12.**    *computer usable medium; computer readable media ['386 patent] (CCC at row 37); computer readable medium ['637 patent] (CCC at row 37)*

     NetRatings' construction of the phrases "computer usable medium" and "computer
readable media" from the '155 and '386 patents is "one or more devices on which data may be
stored in a form a computer can use or read." NetRatings proposes that the phrase "computer
readable medium" from various claims of the '637 patent be construed similarly. WebTrends'

---

[23] This is similar to NetRatings' construction of the immediately preceding phrase in the same claim of
"monitor interaction through the client computer with at least one of the first resource and one or more
second resources" as relating to "a first or second resource." In that instance, WebTrends agreed with this
aspect of NetRatings' construction. CCC at row 27.

[24] In a mystifying change, WebTrends' original construction of this claim element proposed on April 23,
2007 allowed for there to have been a "different second resource" but that option was eliminated when
WebTrends changed its construction on August 24, 2007.

construction of these terms narrows the definition so that it only encompasses "a single storage device." The ordinary definitions of these terms are not as limited as suggested by WebTrends; nor do the specifications of the respective patents require it.

## C.    Terms From the '637 Patent

With the one exception just discussed, the parties have not identified any specific terms from the '637 patent as requiring construction. However, WebTrends has made certain unjustified assertions that some claims of the '637 patent are indefinite. While NetRatings certainly disagrees with WebTrends' position -- the '637 patent claims are clearly not indefinite -- NetRatings reserves full discussion of this issue for its response. Regardless of the substance of their position, *Markman* is not the appropriate time to address validity issues involving a host of evidentiary matters such as expert testimony and factual determinations. *See, e.g., Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (noting that while extrinsic evidence may be used in the process of construing claims, the court does not credit "certain evidence over other evidence" or make "factual evidentiary findings." Though the court's claim construction may be "enlightened by such extrinsic evidence as may be helpful," the court's claim construction is still based upon the patent and prosecution history.")

## D.    Application of 35 U.S.C. § 112 (6) to the '637 and '510 Patents

The parties have agreed that claims 11, 18, 20, 28, 30, 33, 35, 36 and 38-41 of the '637 patent, and claim 9 of the '510 patent, contain means-plus-function elements subject to 35 U.S.C. § 112(6). All of the specific elements from the claims of the '637 patent which the parties have identified are listed in rows 38-46 and the specific element from claim 9 of the '510 patent which the parties have identified is in row 18. As to the remaining elements identified in rows 47-55, WebTrends erroneously contends that these elements are subject to 35 U.S.C. § 112(6). Both categories of elements are addressed in the sections below.

41

1.      *Means Plus Function Terms*

In construing means-plus-function elements, the function of the element is first determined, and then the corresponding structure for performing the function, as described in the specification, is identified. *See WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1347 (Fed. Cir. 1999). *See also Brike Int'l, Ltd. v. Invacare Corp.*, Civil Case No. 05-1754-KI, 2007 U.S. Dist. LEXIS 44003, at *20 (D. Or. Jun. 14, 2007). In the context of claim elements where the disclosed structure is a computer, the structure for such claim elements is the computer, programmed to perform the algorithms disclosed in the specification. *See, e.g., WMS Gaming*, 184 F.3d at 1349 ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."). In accordance with *WMS Gaming*, reference to the patent specification to identify the specific algorithms which the computer code is programmed to perform may be done with explicit reference to text or figures within the specification, or by reference to column and line numbers. *McKesson Info. Solutions LLC v. The Trizetto Group, Inc.*, 426 F. Supp. 2d 197, 202 (D. Del. 2006) (identification of structure includes identifying "the specific algorithm disclosed in the specification, or where it is disclosed (or otherwise inferred)"); *Digeo, Inc. v. Audible, Inc.*, Case No. C05-464JLR, 2006 U.S. Dist. LEXIS 22715, at *45-46 (W.D. Wash. Mar. 27, 2006) (identifying algorithm by citation to column and line references of approximately 77 lines of text); *Bd. of Regents of the Univ. of Texas Sys. v. Eastman Kodak Co.*, Civ. Action No.: SA-04-CA-912-XR, 2006 U.S. Dist. LEXIS 7997, at *58 (W.D. Tex. Jan. 26, 2006) (identifying algorithm by citation to two figures).

NetRatings follows the approach to defining means elements provided for in these and related cases, including by providing citations to the specification text and figures which describe

the structure that performs the function recited in such elements.[25]  The means elements from the '637 patent may be considered in five groups: (a) means for monitoring (CCC at rows 38-40); (b) means for transferring the means for monitoring (rows 41-42); (c) means for transferring the monitoring information (CCC at rows 43-44); (d) means for storing monitoring information (CCC at row 45); and (e) means for accessing the monitoring information (CCC at row 46).[26]  For most of the elements in these groups, the function is as recited in the claim, as identified in Table 3.[27]  For some of the less complex elements, such as the ones in groups (d) and (e) above, it is possible for the Court to replace the specification citations provided by NetRatings in its constructions with actual text and/or figure(s) from the specification, with some paraphrasing to provide context.  NetRatings is prepared to provide such substitutions should the Court request it.

With respect to group (a), which includes elements such as "means for monitoring the change in time of a characteristic of a content display" (CCC at row 38) and "means for monitoring display of the content" (CCC at row 40), the structure for such elements is, in short, a set of computer instructions as described in the specification sections cited, which computer instructions cause one or more computer systems to perform the function recited in the claim.  *See, e.g.,* '637 patent, col. 10, l. 58 – col. 11, l. 2 ("a set of monitoring instructions (which can be

---

[25] To better focus the Court on just those citations in the specification text and figures that directly describe the corresponding structure, NetRatings narrowed the list of such citations from those previously identified in other cases.

[26] In an effort to facilitate the Court's consideration of the means-plus-function issues raised in a more streamlined manner, NetRatings organized the means-plus-function elements into the five groups identified.  Notwithstanding these categories, NetRatings has identified in rows 38-46 of the Claim Construction Chart what it believes is the claimed function and corresponding structure for each of the means-plus-function elements listed therein, and respectfully refers the Court to the foregoing rows for a full recitation of the same.

[27] The function for most of the claim elements at issue conforms to the language of each element itself.  In a few instances, NetRatings provided further construction for the function of the claim element.  Each function is explicitly identified in NetRatings' column of the applicable row of Table 3 of the Construction Chart.

embodied, for example, in a computer program);" "the monitoring instructions cause the client computer at the content display site 302 to monitor the display of the content to produce monitoring information regarding the manner in which the content is displayed").

To illustrate precisely how the structure for each element would be analyzed (for purposes of trial, for instance), one example of the structure for claim 11 (means for monitoring the change in time of a characteristic of a content display) is provided,[28] as follows:

Computer code encoded on a computer readable medium, that, when executed by a computer system, performs the recited function using one or more of the methods of:

- "discern[ing] whether the pointer is located within the content display by monitoring an event that indicates that the pointer has entered the area defined by the content display,"

- "determin[ing] when the on-screen pointer leaves the defined area after each entry, by monitoring another event that indicates that the pointer has exited the area defined by the content display," and/or

- "calculat[ing] the duration of time that the pointer was in the defined area for each entry into the defined area, as well as the total duration of time that the pointer was within the defined area" using "time stamps associated with the entry into and exit from the defined area."

Col. 16, ll. 24-50.

The specification explains that the foregoing example ("entry of a pointer into a defined area"), among others, is one example of a monitoring method in accordance with an embodiment of the invention wherein the "monitoring method monitors the change in time of a characteristic of the content display." '637 patent, col. 16, l. 60 – col. 17, l. 6. With this specific association of

---

[28] Each example reflects one or more possible combinations of the algorithms disclosed in the specification, of which there are many (which makes specific recitation of every such combination impractical). Some of such combinations may be entirely distinct, and others might incorporate part of the examples provided, but then include other steps or methods disclosed in the specification. For instance, the specification also identifies a distinct method of "hiding of the content display" as being applicable to the instant element. *See, e.g.,* '637 patent, col. 16, l. 60 – col. 17, l. 6. A full recitation of the specification sections wherein the algorithms for the elements at issue may be found is set forth in NetRatings' portion of the Claim Construction Statement.

the specification sections set forth above and the element at issue, there can be no question that the identification of structure is correct.

The elements in group (b) (rows 41-42) include "means for transferring the means for monitoring from the content provider site to the content display site in response to the transfer of content from a content provider site." The appropriate structure for these elements comprises computer instructions implemented on a content provider site, computer instructions implemented on a content display site and a communication network, all as described in the specification sections cited by NetRatings in rows 41-42. *See, e.g.,* '637 patent, col. 7, l. 66 – col. 8, l. 5 (in one aspect of the invention, "content is provided by a content provider site over a network to a content display site for display at the content display site, a mechanism for monitoring the display of the content can be transferred from the content provider site to the content display site in response to (e.g., together with) the transfer of content from the content provider site").

The elements in group (c) (rows 43-44) include "means for transferring the monitoring information to a remote site that is part of the network." The appropriate structure for the elements in group (c) consists of computer instructions implemented on a content display site, computer instructions implemented on a content provider site and a communication network, all as described in the specification sections cited by NetRatings in rows 43 and 44 of Table 3. *See, e.g.,* '637 patent, col. 8, ll. 7-12 ("Monitoring information obtained regarding the display of the content at the content display site can be transferred to a remote site that is part of the network. The remote site can, but need not necessarily be, the content provider site form which the content was transferred to the content display site.").[29] NetRatings' identification of structure for the elements in group (c) should be adopted by the Court.

---

[29] *See also* '637 patent, col. 10, ll. 22-32 ("'[c]ontent provider site' refers to a device that is part of the network and that can provide content to another device that is part of the network," "'[c]ontent display

The element in group (d) (row 45) is "means for storing monitoring information at the remote site." NetRatings identified the appropriate structure for this element as "any appropriate database on a computer system at the remote site" as described in the specification sections cited by NetRatings in row 45. *See, e.g.,* '637 patent, col. 21, ll. 18-21 ("the monitoring information can be stored in any appropriate database, as known to those skilled in the art of constructing and managing databases"). NetRatings' position, which includes any appropriate database, including but not limited to one at an application manager's site, should be adopted.

The final group in the '637 patent (row 46) consists of "means for accessing the monitoring information stored at the remote site from a site on the network other than the remote site, such that the user at the other site can interact with the monitoring information but cannot modify the monitoring information." The structure for this element is a set of computer instructions implemented on a computer system as described in the specification sections cited by NetRatings in row 46. *See, e.g.,* '637 patent, col. 23, ll. 14-24 ("a user interface (e.g., GUI [graphical user interface]) can be provided on the content provider site computer to enable the owner (or representative) of the content provider site to access monitoring information"). *See also* '637 Patent, col. 21, ll. 21-24 ("The monitoring information can be presented for observation through a suitable user interface (GUI), in any desired format..."). NetRatings' identification of structure of this element should be adopted by the Court.

In addition to the foregoing elements from the '637 patent, there is one means-plus-function element to be addressed in the '510 patent, specifically "means for interpreting the logged machine operation events by reference to the dictionary" CCC at row 18. NetRatings

---

site' refers to a device that is part of the network and that can receive and display content from another device that is part of the network," "'[c]omputer network' includes any collection of interconnected computer systems").

identified the proper structure for this element as a processing system programmed to perform the

recited function of interpreting the logged machine operation events by reference to the

dictionary, as described in the specification sections cited by NetRatings.  Should the Court

determine it is helpful, NetRatings provides the following prose version of this means element:

"A processing system programmed to recognize, or translate, the information contained in the

data fields of a log entry as, or into, information useful for reporting purposes by reference to

corresponding entries in the dictionary, and all structural equivalents of such processing system."

      **2.**       ***"Instructions" Terms***

     WebTrends takes the position that the "instructions" elements from claims 57, 59, 62, 64

and 65 of the '637 patent, should be treated as means-plus-function elements subject to 35

U.S.C. § 112(6).  WebTrends is incorrect.  These claims all generally begin with the following

text (or some slight variant for dependent claims): "A computer readable medium encoded with

one or more computer programs … comprising instructions . . . "  '637 patent, claims 57, 59, 64

and 65.  Within each of those claims (and their dependents) are elements claiming "instructions"

for performing certain methods.  For instance, independent claim 57 reads as follows:

>     57. A computer readable medium encoded with one or more computer
> programs for enabling monitoring of the display of content by a computer system,
> comprising;
>     instructions for monitoring the change in time of a characteristic of a
> content display; and
>     instructions for evaluating the change in time of the characteristic of the
> content display to produce monitoring information regarding display of the
> content.

     None of the claims at issue contain any "means" language.  As the Federal Circuit has

reiterated on numerous occasions, the absence of such language creates a rebuttable presumption

that 35 U.S.C. § 112(6) does not apply.  *Phillips,* 415 at 1311.  *See also Lighting World, Inc. v.*

*Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004); *Tom Hayden Enters. v. S. Or.*

*Hot Bikes, Inc.*, Civil No. 03-3034-CO, 2004 U.S. Dist. LEXIS 8195, at \*23 (D. Or. Apr. 29, 2004) ("Absence of the term 'means' creates a presumption that the element is not to be construed in accordance with § 112, P 6.").

Moreover, "[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips,* 415 at 1311. The claims at issue clearly identify sufficient structure in claiming "computer readable medium encoded with one or more computer programs … comprising instructions …" for carrying out the specified elements. This conclusion is fully supported by the case law. *See, e.g., Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1231 (N.D. Cal. 2001) ("§ 112, P 6 does not apply to the terms recited in the form, "computer code that [performs x function]."). The *Affymetrix* Court explained that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions." *Id.* In the context of the claims and of the patent, there can be no doubt that "instructions" are computer code. *See, e.g.,* '637 patent, col. 32, claim 59 ("instructions . . . begin executing;" "instructions . . . stop executing"). *See also IEEE* at 8 (instruction: "[a] meaningful expression in a computer programming language that specifies an operation to a digital computer.") and *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 222 (S.D.N.Y. 2000) ("computer code" is "primarily [] a set of instructions which, when read by the computer, cause it to function in a particular way"). Accordingly, the claims at issue from the '637 patent (57, 59, 62, 64 and 65) are not subject to 35 U.S.C. § 112(6).

## CONCLUSION

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings in the attached Claim Construction Chart.


Dated: New York, New York
        September 19, 2007

DREIER LLP

/s/Seth H. Ostrow
SETH H. OSTROW (*Admitted pro hac vice*)
ARIANNA FRANKL (*Admitted pro hac vice*)
KARINE LOUIS (*Admitted pro hac vice*)
DREIER LLP
499 Park Avenue
New York, New York 10022
Telephone: (212) 328-6100
Facsimile: (212) 328-6101
sostrow@dreierllp.com
afrankl@dreierllp.com
klouis@dreierllp.com

DAVID P. COOPER, OSB NO. 88036
ELIZABETH A. TEDESCO, OSB NO. 05093
KOLISCH HARTWELL, P.C.
520 SW Yamhill Street, Suite 200
Portland, Oregon 97204
Telephone: (503) 224-6655
Facsimile: (503) 295-6679
cooper@khpatent.com
tedesco@khpatent.com

Attorneys for Plaintiff NetRatings, Inc.