**DAVID P. COOPER, OSB NO. 88036**
Email: cooper@khpatent.com
**ELIZABETH A. TEDESCO, OSB NO. 05093**
Email: tedesco@khpatent.com
KOLISCH HARTWELL, P.C.
520 SW Yamhill Street, Suite 200
Portland, Oregon 97204
Telephone: (503) 224-6655
Facsimile: (503) 295-6679

**SETH H. OSTROW (admitted *pro hac vice*)**
Email: sostrow@dreierllp.com
**ARIANNA FRANKL (admitted *pro hac vice*)**
Email: afrankl@dreierllp.com
**KARINE LOUIS (admitted *pro hac vice*)**
Email : klouis@dreierllp.com
DREIER LLP
499 Park Avenue
New York, New York 10022
Telephone: (212) 328-6100
Facsimile: (212) 328-6101

*Attorneys for Plaintiff NetRatings, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NETRATINGS, INC.,<br><br>        **PLAINTIFF,**<br><br>v.<br><br>WEBTRENDS, INC.,<br><br>        **DEFENDANT.** | **Civil No.  3:06-cv-1420-HA**<br><br><br>**CLAIM CONSTRUCTION HEARING**<br>**DATE: OCTOBER 29, 2007, 9:00 a.m.**<br><br><br>**NETRATINGS, INC.'S REBUTTAL**<br>**CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ............................................................................................................2

POINT I

WEBTRENDS' RESULT-DRIVEN CONSTRUCTIONS FOR
TERMS FROM THE COFFEY PATENTS SHOULD BE REJECTED ...........................2

A.    WebTrends' Fundamental Mischaracterizations Of The Inventions  Of The Coffey
Patents Generally And Of The Asserted Claims.................................................2

B.    Disputed Terms In The '510 And '680 Patents ................................................4

    1.    *local computer use meter/user meter (CCC at row 1)* ............................4

    2.    *installed in user computer machines (CCC at row 2)*..........................8

    3.    *log / log of predetermined events (CCC at row 3)* ................................10

    4.    *identify titles of open windows and reflects a log of titles  of worldwide web pages
(CCC at row 11)*.....................................................................................13

    5.    *dictionary (CCC row 13)* ......................................................................15

    6.    *storing each of the events in said log in the local computer memory of said user
computer systems (CCC row 9); storing said log of predetermined events by each
use meter in an associated user computer machine (CCC row 10)*.......................16

    7.    *Means For Interpreting The Logged Machine Operation Events By Reference To
The Dictionary File (CCC row 18)*........................................................17

POINT II

WEBTRENDS' PROPOSED CONSTRUCTIONS OF THE '155
AND '386 PATENT CLAIM TERMS SHOULD BE REJECTED
AS WEBTRENDS FAILED TO OFFER ANY ARGUMENT TO
SUPPORT MANY OF THESE TERMS AND OTHERWISE
SIMPLY TRIES TO READ SELECTED LIMITATIONS
FROM EMBODIMENTS INTO THE CLAIMS ...........................................20

A.    The Court Should Adopt NetRatings' Constructions Of Claim Terms In The '155 And
'386 Patents For Which WebTrends Has Not Even Attempted To Provide Any
Supporting Rationale In Its Opening Brief .......................................................20

B.    WebTrends Mischaracterizes The Inventions Of The '155 And '386 Patents And Its
Proferred Constructions Uniformly Depend On Reading Selected Limitations From The
Specification Into The Claims .........................................................................21

    1.    *WebTrends Mischaracterizes The Inventions Of The '155 And '386 Patents As
Necessarily Involving A Software Program That Monitors A User's Interaction
With A Network Resource "Over A Period Of Time"* ...........................21

    2.    *tracking program (CCC at row 20)* .....................................................24

i

3.      *Monitor Interaction Through The Client Computer With At Least One Of The First Resource And One Or More Second Resources ('386 patent) (CCC at row 27); Monitor Use Of The Resource ('155 patent) (CCC at row 23)* ......................25

4.      *Downloading Of The First Resource Causes Downloading Of The Tracking Program (CCC at row 35)* ..................................................................................26

5.      *The One Or More Second Resources Having Been Obtained By The First Client From A Server Of The One Or More Servers As A Result Of Interaction Through The First Client With At Least One Of The First Resource And A Second Resource Of The One Or More Second Resources (CCC at row 36)* ...................................27

6.      *The First Server And Second Server Comprising Two Servers (CCC at row 34)* .28

7.      *Executable Program Not Being Part Of The Resource (CCC Row at 22)* ...........29

8.      *Client Identifying Indicia (CCC at row 28)* .........................................................31

POINT III

WEBTRENDS' PROPOSED CONSTRUCTIONS
OF THE '637 PATENT ARE FATALLY FLAWED ......................................................32

A.      WebTrends Fundamentally Mischaracterizes The Inventions Of The '637 Patent, Misapplies The Governing Law Under 35 U.S.C. § 112(6) And, In Making Indefiniteness Arguments, Ignores Corresponding Structure Disclosed In The Specification................32

B.      The Structures Disclosed In The Specification Corresponding To Various Means-Plus-Function Elements In The Claims Are Not Limited To The Exemplified Java Applet Embodiment Disclosed, But Are Instead The Set Of Computer Instructions Described In The Specification For Performing The Respective Recited Functions..............................35

C.      WebTrends' Assertion That Various Terms In The '637 Patent Are Indefinite, And Hence Invalid, Is Out Of Place In This Claim Construction Proceeding, Misapplies The Law On Identifying Structure Corresponding To Functions Recited In The Claims And Ignores The Numerous Specification Passages Disclosing Corresponding Structure.......38

1.      *means for evaluating the change in time of the characteristic of the content display to produce monitoring information (CCC at row 39)* ...............................39

2.      *means for transferring the monitoring information from the content display site to a remote site of the network that is different from the content provider site (CCC at row 44)* ............................................................................................................39

3.      *means for accessing the monitoring information stored at the remote site from a site on the network other than the remote site, such that a user at the other site can interact with the monitoring information, but cannot modify the monitoring information (CCC at row 46)* ...........................................................................40

D.      The "Instructions" Elements Are Not Means-Plus-Function Elements And, Therefore, Are Not Subject To Section 112(6) And Should Be Given Their Plain And Ordinary Meaning ..........................................................................................................41

CONCLUSION..................................................................................................................45

ii

# TABLE OF AUTHORITIES

## CASES

*Affymetrix, Inc. v. Hyseq, Inc.,*
    132 F. Supp. 2d 1212 (N.D. Cal. 2001) ...........................................................................43

*Alacritech v. Microsoft Corp.,*
    No. 3:04-cv-03284, 2005 WL 850729 (N.D. Cal. April 12, 2005) ...........................34, 43

*Atmel Corp. v. Information Storage Devices, Inc.,*
    198 F.3d 1374 (Fed. Cir. 1999).......................................................................................19

*Automotive Technologies International v. BMW of North America,*
    No. 2:01-cv-71700, 2007 WL 2493281 (Fed. Cir. Sept. 6, 2007) ......................................7

*Biomedino, LLC v. Waters Technologies Corp.,*
    490 F.3d 946 (Fed. Cir. 2007).........................................................................................18

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
    334 F.3d 1294 (Fed. Cir. 2003).........................................................................................5

*CCS Fitness v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002).......................................................................................36

*Creo Products, Inc. v. Presstek, Inc.,*
    305 F.3d 1337 (Fed. Cir. 2002).................................................................................. 38-39

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
    849 F.2d 1430 (Fed. Cir. 1988).........................................................................................6

*Fonar Corp. v. General Elec. Co.,*
    107 F.3d 1543 (Fed. Cir. 1997).......................................................................................36

*JVW Enterprises, Inc. v. Interact Accessories, Inc.,*
    424 F.3d 1324 (Fed. Cir. 2005).......................................................................................16

*Kao Corp. v. Unilever U.S., Inc.,*
    334 F. Supp. 2d 527 (D. Del. 2004)...................................................................................6

*Lighting World, Inc. v. Birchwood Lighting, Inc.,*
    382 F.3d 1354 (Fed. Cir. 2004).........................................................................12, 42, 43

*Mass. Inst. of Tech. & Elecs. for Imaging, Inv. v. Abacus Software,*
    462 F.3d 1344 (Fed. Cir. 2006).......................................................................................42

*Nazomi Communications, Inc. v. Arm Holdings, PLC,*
    403 F.3d 1364 (Fed. Cir. 2005).....................................................................................8, 38

*nCUBE Corp. v. Seachange Int'l, Inc.*,
    436 F.3d 1317 (Fed. Cir. 2006)............................................................................6

*On Demand Machine Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006)....................................................................... 7-8

*Phillips v. AWH Corporation*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................. *passim*

*Tandon Corp. v. U.S. Int'l Trade Comm'n,*
    831 F.2d 1017 (Fed. Cir. 1987) ..............................................................25, 42

*Trading Technologies Int'l, Inc. v. ESpeed, Inc.*
    No. 1:04-cv-05312, 2006 WL 3147697 (N.D. Ill. Oct. 31, 2006)..............................34, 43

*Verizon Services Corp. v. Vonage Holdings Corp.*,
    No. 1:06-cv-00682, 2007 WL 2781869 (Fed. Cir. Sept. 26, 2007) ................................ 3-4

*WMS Gaming Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999)..........................................................................35

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. submits this Rebuttal Claim Construction Brief in further support of its proposed constructions of terms from the asserted claims of the patents-in-suit and in response to Defendant WebTrends, Inc.'s Opening Claim Construction Brief ("WT Br.")

In its brief, WebTrends pays lip service to the legal principles of claim construction, but then consistently violates them. For example, while acknowledging that the claims define the scope of the invention, WebTrends repeatedly mischaracterizes the claimed inventions and defines various claim terms by importing limitations from the specification. For example, WebTrends selectively references one of the many possible functions performed by the tracking program of the Davis patents, keeping track of time, and then asserts, with no support whatsoever, that such function must be read into the claims as an absolute limitation. WebTrends' objective is transparent -- to try to limit the claims by incorporating random limitations from illustrative embodiments just enough so its technology may purportedly not infringe. This is not a legitimate or proper basis for or method of claim construction.

Moreover, the alleged support identified by WebTrends for its constructions is often inaccurate, incomplete or simply non-existent. For example, concerning the "log" of the Coffey patents, WebTrends excerpts part of an example log from the '510 patent that it contends shows that the log includes events that occur over a period of time, but conveniently *omits* the section of the *very same example* that clearly shows events captured which did *not* occur at any particular time, much less over a period of time. WT Br. at 11. Similarly, WebTrends quotes partial sentences from the specifications in purported support of its constructions but then often fails to explain how such citations, even assuming they should somehow be read as limitations on the claims, result in the specific limitations in WebTrends' constructions.

WebTrends restates the basic legal principle that the claims are to be interpreted based on the intrinsic evidence, yet then relies heavily on extrinsic evidence, including an expert declaration, in support of its constructions.  WebTrends makes additional errors, such as ignoring dependent claims that contradict its positions, ignoring aspects of preferred embodiments, and using dictionaries not only from the wrong time frame but which contradict the majority of other contemporaneous dictionary sources.  All of these tactics have been faulted by the Federal Circuit as violating well-established legal principles.

Finally, WebTrends asks the Court to determine, prematurely and without anything resembling a proper, much less adequate, record of factual or expert evidence, which claim elements are purportedly invalid for being indefinite.

For the reasons stated in NetRatings' Opening Brief and further below, it is NetRatings' constructions, and not WebTrends, which should be adopted by the Court because they are clear, supported by the intrinsic evidence and consistent with established legal principles.

<u>**ARGUMENT**</u>

**POINT I**

**WEBTRENDS' RESULT-DRIVEN CONSTRUCTIONS**
<u>**FOR TERMS FROM THE COFFEY PATENTS SHOULD BE REJECTED**</u>

**A.    WebTrends' Fundamental Mischaracterizations Of The Inventions**
**Of The Coffey Patents Generally And Of The Asserted Claims**

As explained in NetRatings' Opening Claim Construction Brief ("NR Br."), prior to the inventions described in the Coffey Patents, information regarding a computer user's on-line activity was only collected at the server side, that is, at the location of the server computer which

received requests for content.  NR Br. at 6-7.  *See also* '510 patent, col. 1, ll. 22-23.[1]  The inventions of the Coffey Patents provided the breakthrough technology of putting software on the user's computer to monitor what Internet users were doing on the web, making it possible, for example, to determine which web sites individual Internet users have visited.  NR Br. at 7.[2]

Achieving the objectives of the inventions of the Coffey Patents is not dependent on, for example, whether the monitoring software comprises a "stand-alone" program, or is "permanently" installed on the user's computer.  Nor are limitations such as these recited in the claims, the specification or file history.  Nevertheless, WebTrends would have the Court add these and other limitations into the claims by adopting WebTrends' proposed constructions.  One does not have to look far to see why WebTrends does this.  From the outset of WebTrends' opening brief, rather than focusing on accurate claim construction, WebTrends takes pains in its argument to try to portray its products as different from the patented technology.  *See, e.g.,* WT Br. at 1, 4.  The objective here, however, is not to assess WebTrends' technology; that exercise is reserved for the infringement determination phase of the case.  The present objective is to construe the claim terms in accordance with established legal principles, focusing on the intrinsic evidence first and foremost.  As discussed further below, WebTrends' claim construction approach, which violates many such legal principles, should be rejected by the Court.[3]

---

[1] The asserted patents, U.S. Patent Nos. 5,675,510 (the "'510 patent"), 6,115,680 (the "'680 patent"), 6,138,155 (the "'155 patent"), 6,763,386 (the "'386 patent"), and 6,108,637 (the "'637 patent"), are annexed as Exhibits A-E to the Declaration of Seth H. Ostrow, dated Sept. 19, 2007 ("Ostrow 9/19 Decl."), which was filed with NetRatings' Opening Claim Construction Brief.

[2] WebTrends characterizes itself as a "pioneer" and "leading developer" of web analytics software.  WT Br. at 3.  However, until relatively recently WebTrends only used technology that analyzed server logs, characterized by WebTrends as "old technology."  WT Br. at 4; NR Br. at 3-5.  Contrary to its assertions, WebTrends was anything but a "pioneer" in the use of client-side analytics technology of the type described and claimed in NetRatings' patents asserted in this case; indeed, WebTrends only started using that technology years after NetRatings' patents were filed, and well after NetRatings and others had already proven its value.  NR Br. at 3-5.

[3] *See, e.g., Phillips v. AWH Corporation*, 415 F.3d 1303, 1323 (Fed. Cir. 2005).  *See also, Verizon Services Corp. v. Vonage Holdings Corp.*, No. 1:06-cv-00682, 2007 WL 2781869, at *6 (Fed. Cir. Sept. 26, 2007) (rejecting several attempts by the accused infringer to read limitations into the claims when "[n]othing other than specification

**B.**    **Disputed Terms In The '510 And '680 Patents**

1.    *local computer use meter/user meter (CCC at row 1)* [4]

The dispute with respect to these terms centers on WebTrends' effort to introduce two limitations that appear nowhere in the claims: first, that the meter be a "stand-alone" program; and second, that the meter must be capable of measuring the use of "any" other applications running on the computer.[5]

WebTrends incorrectly attributes its "stand-alone" limitation to the specification.  *See* WT Br. at 13 ("The Coffey patents explain that a 'computer use meter' is a stand-alone program").  The Coffey patents "explain" no such thing.  Indeed, not a single one of the specification passages cited by WebTrends in purported support of its construction uses the term "stand alone" or any phrase having a similar meaning.  In fact, the term "stand alone" does not appear anywhere in the patents.  While it can be fairly said that, in some specification embodiments, the meter is described with characteristics consistent with a stand alone program, there is nothing in the patents that even suggests, much less requires, such a limitation be placed on the claims.  Indeed, many of those same characteristics are also consistent with the meter *not* being a stand-alone program, *e.g.,* that it has a "main operating module," '510 patent, col. 6, l. 14, that it maintains "as passive a profile as possible," '510 patent, col. 4, ll. 59-60, and that it works with "automated installation and data transfer programs." '510 patent, col. 4, ll. 60-63.

examples supports" the proposed claim construction).  The *Verizon* court further stated that  "[t]he mere fact that the specification's examples of translation may involve a change in protocol from a higher to a lower level protocol does not establish that such a limitation should be imported into the claims."  *Id*. at *5.  *See also* NR Br. at 14.

[4] References to the Claim Construction Chart follow the form: (CCC at row ___).  Row references are to the numbered rows in the Claim Construction Chart.

[5]  As explained in NetRatings' Opening Brief, WebTrends changed its constructions of multiple terms on several occasions.  NR Br. at 15-16.  WebTrends continues this pattern with respect to the local computer use meter.  Specifically, WebTrends' prior proposed construction for the term included a third limitation concerning how the meter collected information ("by intercepting the message traffic of those other programs").  *See* Ostrow 9/19 Decl. Ex. L.  In its Opening Brief, WebTrends appears to have jettisoned this unsupported limitation, omitting the limitation from its construction identified in its Brief.  WT Br. at 12-13.

Nor is WebTrends' position buttressed by the so-called "objects of the invention," which WebTrends inaccurately identifies in any event.[6]  Although it is not proper to limit claims based on stated objects of the invention, those goals identified in the Coffey Patents do not support WebTrends' unduly narrow construction in any event.  *See, e.g., Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300-1301 (Fed. Cir. 2003) (rejecting argument that "the scope of the claims is limited based on statements made in the Objects of the Invention" and noting that "[t]he objective described is merely one of several objectives that can be achieved through the use of the invention … 'Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention.'").  The described objects of the inventions and problems identified as needing solution focus on the meter being "local" and the type of data to be collected, not on whether the meter is a stand alone program. *See, e.g.,* '510 patent, col. 1, ll. 35-45 and ll. 22-23 (object to "facilitate [the] collection of reliable information regarding the use of personal computer software"; object to "facilitate the collection of reliable multi-media viewing statistics of commercial on-line services as well as access to the 'information superhighway,' including the use of the Internet's World Wide Web"; prior to the invention, "there has been no effective reliable mechanism to measure computer usage on a local or broad basis").[7]  Highlighting the inaccuracy of WebTrends' characterization of the objectives of the invention, WebTrends' proposed construction fails to account for the term "local," which is one of the chief objects of the Coffey invention and is *in the claims*.

---

[6]  WT Br. at 13, n. 10 (WebTrends refers to only one "object of the invention" when in fact there are numerous objects identified).  *See, e.g.,* '510 patent, col. 1, ll. 35-50

[7]  WebTrends presents a declaration by its expert Aaron E. Walsh to try to support its construction.  *See* Declaration of Aaron E. Walsh, dated September 14, 2007, at ¶ 24 (hereinafter "Walsh Decl.").  However, Mr. Walsh's opinions suffer from the same defects as WebTrends arguments -- there is simply no support for such a narrowing limitation. *See also* Declaration of Dr. Benjamin Goldberg, dated October 19, 2007, at ¶ 11 (hereinafter "Goldberg Decl.").

WebTrends would also have it that the "local computer use meter" necessarily be able to measure "*any*" other application programs running on the computer.  WT Br. at 12.  What WebTrends means by this is that the meter must be able to monitor **all** other applications.  Such a requirement appears nowhere in the claims or specification.  WebTrends cites a single specification passage in an attempt to support its limiting construction, but the cited passage actually supports the opposite conclusion.  WT Br. at 13 (citing '510 patent, col. 3, ll. 42-46).  The specification states: "[t]he use of any software product or application program may automatically trigger an event message in the operating system environment which *may* be recorded by the system."  '510 patent, col. 3, ll. 42-46 (emphasis supplied).  The use of the word "may" plainly shows that the description is of one possible embodiment.  *See, e.g., Kao Corp. v. Unilever U.S., Inc.*, 334 F. Supp. 2d 527, 545 (D. Del. 2004) ("This permissive 'may' language does not restrict the claimed invention to a particular formulation, but instead expressly leaves open the possibility of other formulations.").  There is certainly nothing in the passage itself or in the surrounding text, or anywhere else in the intrinsic evidence that requires that the local computer use meter necessarily have the capability to capture events "from *whatever* applications happen to be running on the computer."  WT Br. at 13 (emphasis added).  "[I]t is improper to read a limitation 'into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'"  *nCUBE Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1322 (Fed. Cir. 2006) (*citing E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)).[8]

---

[8]  WebTrends (and its expert) refers to an "auditing" technique as allegedly supporting its construction.  This technique, however, is the subject of claims which have not been asserted in this case and relate to matter included in the '680 patent only.  All of the claims asserted in this case, from both Coffey Patents, date back to the specification as filed for the '510 patent.  Thus, new matter that was added when the '680 patent was filed is not pertinent.  *See* Goldberg Decl. at ¶ 19.

Indeed, the claims themselves suggest the types of applications from which the local computer use meter collects information, in identifying the type of predetermined events which may be contained in or reflected by the log included in the meter.  *See*, *e.g.*, '510 patent claim 1 ("titles of worldwide web pages") and '680 patent claim 1 ("character strings reflecting on-line activity").  Particularly because the claims already give indication of the types of applications from which the computer use meters collect events, adding the extra requirement that the computer use meter be capable of measuring the usage of *any and all* other applications is an improper attempt by WebTrends to rewrite the claims.

For its part, WebTrends contends that NetRatings' proposed construction is "overbroad" and seeks "to encompass any computer program that can collect information regarding the use of other computer programs on a computer."  WT Br. at 14.  In doing so, however, WebTrends reveals the fallacy in its entire approach to claim construction, by criticizing NetRatings for not accounting in its construction for such items of information as "the means by, or the circumstances under" which the claimed meter collects its information.  *Id.* These items of information do not answer the question *what* a meter is, but rather add additional limitations which does not appear in these claims in an attempt to answer other questions, such as *how*, *when* or *where* the meter works.  Claim construction is about defining claim terms, not drafting encyclopedia entries on everything that could be known about the terms.

WebTrends goes on to argue that the Court should reject NetRatings' construction as producing invalid claims, contending that NetRatings' construction is broader than the "inventor's actual invention."  *Id.*  This position has no merit.[9]  NetRatings is not advancing an

---

[9]  WebTrends' reference to two cases on this issue are off-point.  WT Br. at 14.  *Automotive Technologies International v. BMW of North America*, No. 2:01-cv-71700, 2007 WL 2493281 (Fed. Cir. Sept. 6, 2007) is entirely inapposite, since the relevant claim construction there was undisputed.  Similarly, *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006), has no factual similarity to the patents-in-suit here and is

"overbroad" construction by objecting to WebTrends' attempt to read a host of unwarranted

limitations into the claims.

      2.     *installed in user computer machines (CCC at row 2)*

      The term "installed in user computer machines" appears in claim 1 of the '510 patent and

in independent claims 1 and 12 of the '680 patent.  NetRatings proposed construction is:

      Placed on and ready for use by a user computer.

WebTrends proposed construction is:

> **Permanently** placed **by a user** on **a hard drive or other permanent storage** of a
> personal computer, and **able to run whenever the personal computer is in use**, **until
> uninstalled by a user**.

WT Br. at 14 (emphasis added).

      Here again, WebTrends seeks improperly to incorporate a number of limitations into the

otherwise unencumbered language of the claims.  As WebTrends would have it, the installation

must be (i) "permanent," at least until uninstalled by a user, (ii) performed by a user, and (iii) the

program installed must be able to run whenever the computer is in use.  Once again, however,

not a single one of these limitations is recited in the claims, nor are they required by the

specification or the file history.

      WebTrends offers two arguments in support of this construction; both are without merit.

First, WebTrends argues that the ordinary meaning of the word "installed" should be apparent to

a lay judge and necessarily includes all of its proposed limitations.  WT Br. at 14-15.  This

contention is contradicted by WebTrends' own proposed construction, by the plain meaning of

---

merely cited for the truism that the claimed invention cannot validly be of broader scope than the invention
disclosed in the specification.  The plain fact is that this briefing concerns claim construction, not validity.
WebTrends has made no showing that any claim of the asserted patents is invalid and, pursuant to 35 U.S.C. § 282,
all of the issued claims of the patents are entitled to a presumption of validity.  *See Nazomi Commc'ns, Inc. v. Arm
Holdings, PLC*, 403 F.3d 1364, 1368-69 (Fed. Cir. 2005) ("[I]t is essential to understand the claims before their
breadth is limited for purposes of preserving validity.  Otherwise the construing court has put the validity cart before
the claim construction horse.").

installed, including as found in dictionary definitions, and is inconsistent with objectives of the invention. Clearly, these requirements are stated nowhere in the claims, the specification or the file history. Instead, as set forth in NetRatings' Opening Brief, various passages in the specification contemplate automated installation (*see, e.g.,* '510 patent, col. 3, ll. 6-16) in addition to installation by a user or other person. NR Br. at 19. Furthermore, it is nonsensical to say that computer programs are "permanently" installed if they may be uninstalled, which is precisely what WebTrends' construction provides (it asserts that installation is "permanent" until it isn't, *i.e.,* when the program is "uninstalled").

Similarly, WebTrends asserts that NetRatings' construction should be rejected because it could encompass running the program from removable media, such as a CD-ROM. WT Br. at 15. WebTrends contends that such a "user-determined presence" of the local computer use meter, one which would "make data collection entirely dependent on a user's cooperation," is "antithetical" to the patents' teaching of "automated, comprehensive, and reliable collection" of computer use data. *Id.* But there is nothing in the claims or in the specification which requires that the "use meter" be installed or run for any particular period of time (the exemplified embodiments involve illustrative use for an undefined period).[10] Moreover, this rationale further exposes the self-contradictory nature of WebTrends' argument on this point: in the same breath that WebTrends argues that "installed" must mean permanently stored until "uninstalled by a user," WebTrends also maintains that the presence of the meter cannot be "user-determined" or "dependent on a user's cooperation."

Additionally, the adjective "permanently" is a modifier of the term "installed"; it is not inherent within the latter term. Equally clear, in this context, the concept that an installation

---

[10] Similarly, WebTrends' citations to the specification relate to illustrative embodiments of how the local computer use meter may operate, such as without involvement by the user or for an extended period, but these limitations are nowhere stated as requirements of the claimed meters. *See* WT Br. at 14-15.

must be performed by a user as opposed to another person, or through automated means, is by no means inherent in the term "installed" since obviously all of those methods are possible. Indeed, the Coffey patents specifically contemplate the use of an automated installation program. '510 patent, col. 4, ll. 60-63. Nor does it make any sense to say that the software program that is installed is necessarily "able to run whenever the personal computer is in use" for the simple reason that the software may be configured to only run in certain predetermined instances. And, it makes no sense to define a word by reference to itself, as WebTrends has done by effectively saying that "installed" means a permanent placement until "uninstalled."[11] None of these limitations are found in common dictionary definitions, which support NetRatings' construction. *See* NR Br. at 21, n.14. Finally, there is no requirement in the claims, the specification or the file history that the meter be installed in a particular place inside the computer: the claim term is "installed in user computer machines." As long as the meter is installed in the user's computer and ready for use, the objectives of the inventions can be achieved.[12]

3.      ***log / log of predetermined events (CCC at row 3)[13]***

The parties' dispute regarding these claim terms revolves around WebTrends' attempt to improperly import limitations into them.

First, WebTrends attempts to limit the "log" to a "file" because the specification refers to a "log file." WT Br. at 11. However, the specification also consistently refers to the log without

---

[11] Alternatively, if "uninstalled" needs no construction then "installed" should not either.

[12] WebTrends' reliance on a statement made during the prosecution of an unrelated patent, with different inventors and owned by different entities at the time the statement was made, is inapposite for those reasons alone. *See* WT Br. at 15, n.11. Moreover, the statement is not referring to any terms from the claims of the Coffey patents, as evidenced, among other things, by the reference to "a selected panel of users representative of a population," which appears nowhere in the claims.

[13] Although WebTrends has asserted constructions for the claim terms "events" and "machine operation events," CCC at rows 4 and 5, it fails to present any arguments in support of those construction in its opening brief. For at least that reason, the Court should adopt the constructions for these terms proposed by NetRatings or, at the very least, conclude that no construction of these terms is required.

use of the word "file." *See, e.g.,* '510 patent, col. 2, l. 54 (referring to the "data log" and a "log" with no qualifier); col. 2, ll. 58 and 59 (referring to an "event log"); col. 2, l. 63 (referring to a "local personal computer use log"); col. 4, l. 31 ("information recorded in the log is valuable"). Clearly, the specification allows for the log to sometimes take the form of a file and sometimes not. Indeed, the occasional reference in the specification to a "log file" and the absence of the term in other places and in the claims is forceful evidence that the log should not be limited to a "file." *Phillips v. AWH Corporation*, 415 F.3d 1303, 1311 (Fed. Cir. 2005) (reference to "steel baffles" implies that baffles need **not** be made of steel) (emphasis added). Thus, neither the claims nor the specification require that the log must be in the form of a file.

Second, WebTrends' proposed construction of log also requires that the log must be "designed to contain multiple records of events occurring over a period of time" and that the claimed log of predetermined events must *actually contain* "multiple records of event selected in advance for inclusion in the log." WT Br. at 10-11. There is simply no requirement in the claims or the specification that the log contain data regarding more than one event. Certainly, the claims provide for multiple events to be preselected for inclusion in a given log. However, if only one such preselected event occurs, there may be only one entry in that log. Thus, while the log *may* contain multiple entries, neither the specification nor the claims require it. *See* '510 patent, col. 1, ll. 57-60 ("According to the invention, operating system messages *may* be intercepted and relevant messages may be recorded in a log file, along with other pertinent or useful information.") (emphasis added); '510 patent, col. 2, ll. 23-25 ("Events which are specific to child Windows of an application may not necessarily be logged."). Examples of logs in the specification which contain multiple entries are just that -- examples -- and do not require that

the claimed "log" be so limited. *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004).

Although purporting to rely on the "ordinary meaning" of claim terms, WebTrends' proposed construction actually conflicts with the plain meaning of the term as set forth in technical dictionaries in use as of the filing date of the '510 Patent. These sources define log as "a record" and do not impose the requirement of "containing multiple entries." NR Br. at 21. WebTends' reliance on other extrinsic evidence in the form of its expert's contending that the ordinary meaning of "log" supports its construction is an improper attempt to use extrinsic evidence to narrow claims that are otherwise unambiguous. *Phillips*, 415 F.3d at 1319.

Additionally, there is no support in the intrinsic evidence for a requirement that multiple entries in a log *occur over a period of time*, as WebTrends contends. WebTrends asserts that a *portion* of an illustrative log file in the specification shows multiple events occurring over a period of time. WT Br. at 11. As with its other attempts to limit the claims using examples from the specification, the cited illustrative log actually contradicts WebTrends' position. That is, the very example log relied upon by WebTrends contains another set of entries, *omitted by WebTrends in its brief*, that precede the portion it cites and that have an identical time and date: "10:40:27" on "05/25/95." '510 patent, col. 8, ll. 32-41, reproduced below:

| 00001 | 05/25/95 | 10:40:27 | METER | 1234561 0000 | [D=02.00-02] |
| 00002 | 05/25/95 | 10:40:27 | PANEL | 1234561 0000 | [D=John Doe] |
| 00003 | 05/25/95 | 10:40:27 | START | 1234561 0000 | [D=ini StartTask=1 EndTask=1 Minimize=2 Maximize=1 Activate=1 Restore=1 Running=1] |
| 00004 | 05/25/95 | 10:40:27 | RUNNG | 1234561 2a96 | [D=C:\DOS\MOUSE\POINTSR.EXS] [T=Pointer Options] [S=10432] |
| 00005 | 05/25/95 | 10:40:27 | RUNNG | 1234561 201e | [D=C:\WINDOWS\NETDDE.EXS] [T=NetDDE] [S=$2432] |
| 00006 | 05/25/95 | 10:40:27 | RUNNG | 1234561 1f6e | [D=C:\WINDOWS\SYSTEM\ DDEML.DLL] [S=39424] |
| 00007 | 05/25/95 | 10:40:27 | RUNNG | 1234561 0736 | [D=C:\WINDOWS\SYSTEM\ USER.EXE] [S=264096] |
| 00009 | 05/25/95 | 10:40:27 | RUNNG | 1234561 37de | [D=C:\HTI\HTI.EXE] [T=HTI] [S=55656] |
| 000010 | 05/25/95 | 10:40:27 | MIMIM | 1234561 37de | [D=C:\HTI\HTI.EXE] |

'510 patent, col. 8.

With each of the ten entries of the exemplary log being associated with *the same date and time*, it is obvious that WebTrends' requirement that a log must include events occurring over a period of time is not even supported by the example on which it relies much less required by the specification.  Moreover, some of the event types captured in the log do not *occur* at any specified date or time, such as the "METER" event type which captures application and version information about the meter and the "PANEL" event type which captures a panelist's name. '510 patent, col. 9, ll. 28-34.  Clearly, the specification allows for one or more predetermined events to be recorded in a log whether or not they occur at a certain time or over a period of time.

### 4.    *identify titles of open windows and reflects a log of titles of worldwide web pages (CCC at row 11)*

The term "identify titles of open windows and reflects a log of titles of worldwide web pages" appears in claim 1 of the '510 patent.  NetRatings' proposed construction of this term is:

contains characters identifying open windows and worldwide web pages

and

reflects a record of characters useful in identifying worldwide web pages.

13

CCC at row 11.

WebTrends' proposed construction is:

> The log contains the titles, **as displayed in the title bar,** of **at least two** open windows and of **at least two** world-wide web pages.

WT Br. at 15 (emphasis added).

There seems to be agreement that these terms at least mean, as NetRatings proposes, contains characters identifying open windows. But WebTrends seeks to add two significant limitations into the claim. Specifically, WebTrends insists that the log contain the *full title, "as displayed in the title bar."*

WebTrends' insistence that the full title of the window or web page be recorded is unwarranted. On the other hand, NetRatings' construction relies on the descriptions of the function of the titles as disclosed in the intrinsic evidence, namely, to provide sufficient web page identifying information to ascertain which web pages users access. *See* NR Br. at 27-28. The plain meaning of the claim term "identify" is to provide sufficient information to accurately record and report which web page a user has accessed.[14] For example, WebTrends states that the full displayed title for the CNN web site is: "CNN.com-Breaking News, U.S. World, Weather, Entertainment & Video News." *See* WT Br. at 16, n. 14.[15] Clearly, many fewer than all of the characters of this title would be sufficient to identify it for the purposes of the claimed invention. Prof. Goldberg affirms that one of ordinary skill at the time would understand this term of the claims in the functional sense described above and as not requiring a so-called *full* title of the web page. *See* Goldberg Decl. ¶ 16.

---

[14] Similarly, "reflecting a log of web pages" plainly refers to data sufficient to identify the web pages.

[15] The specification passages that WebTrends references are illustrative embodiments and, even as cited by WebTrends, often expressly state what "may" be included; none of these passages say that the full title as displayed in a title bar or anywhere else must necessarily be logged. *See* WT Br. at 16.

This common sense approach is confirmed by at least one example in the Coffey patent specifications. As one illustration of a Window title, the specification cites to the title "Write" in Prodigy's electronic mail window. '510 patent, col. 4, ll. 20-23. However, the full text of the title bar in the Prodigy's email window was actually "Prodigy Mail - Write." *See* Exs. A and B to the Declaration of Seth Ostrow, dated October 19, 2007 ("Ostrow 10/19 Decl."). This illustrates that the disclosed method and the objective of the invention is to record sufficient characters to identify a window and no more.

Moreover, WebTrends asserts that a web page's URL is different from its title, and that the Coffey patent specifications distinguish between web pages titles and URLs.[16] This is simply incorrect both as to URLs and as to what the patent discloses. Indeed, URLs are often set forth in the title bar of a browser. *See* Ostrow 10/19 Decl. Ex. C. URLs can also be treated as the default titles of pages in some browsers such the Internet Explorer browser. Goldberg Decl. at ¶ 14.

**5.      *dictionary (CCC row 13)***

The term "dictionary" is used in claim 11, and the term "dictionary file" is used in independent claim 9, of the '510 patent. NetRatings' construction of "dictionary" is a "database or file containing entries used to interpret or correlate data." CCC at row 13. WebTrends' construction is: "A file used to interpret raw data provided by event log files." *Id.* The dispute here is not as narrow as WebTrends asserts. WT Br. at 18.

The first issue is whether the term "dictionary" by itself, as used in claim 1 of the '510 patent, necessarily means a "dictionary file" as proposed by WebTrends. As fully addressed in

---

[16] One specification reference relied on by WebTrends for this purpose, '510 patent, col. 2, ll. 49-50 (WT Br. at 16), actually contradicts its position, in that it refers to "current *Windows* title and the Universal Resource Locator (URL)," suggesting that the URL could be the *web page* title reflected in the log along with the open *window* title.

NetRatings' Brief, WebTrends' construction violates the doctrine of claim differentiation since claim 11 recites "dictionary" while claim 9 recites "dictionary file." *See* NR Br. at 29. Certainly there is no common definition of dictionary that requires it to be a "file." Hence NetRatings proposes that it be construed as a database or file. Figure 1 of the '510 patent shows the dictionary as a database through use of the drum symbol. *Compare* item 14, the "customized dictionary," with item 13 (the computer usage *database*) and item 16 (the Powerview *database*). In addition, the specification refers to the customized data dictionary as being created using a database management system. '510 patent, col. 5, l. 32.

WebTrends asserts that the dictionary must necessarily interpret "raw data provided by event log files." *See* WT Br. at 18. However, the passage in the specification that WebTrends cites is contained in a paragraph that expressly concerns **"an embodiment of the invention;"** plainly, it is not the only possible embodiment. As the Federal Circuit has made clear:

> We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that "the patentee ... intends for the claims and the embodiments in the specification to be strictly coextensive."

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005), citing *Phillips*, 415 F.3d at 1323. Clearly, the claims indicate that the "dictionary" will be used to interpret or correlate logged data; they do not require that the data necessarily be in "raw" form.

### 6. *storing each of the events in said log in the local computer memory of said user computer systems (CCC row 9); storing said log of predetermined events by each use meter in an associated user computer machine (CCC row 10)*

The meaning of these terms is straightforward. NetRatings' constructions reflect that: in the first instance, essentially placing each of the events in the log in memory of the user computer, and in the second, essentially placing the log in the user computer. WebTrends'

16

proposed construction requires that the log have been previously created and that it be copied into a different storage location on the user's computer. Once again, none of these limitations appear in the claims, and the allegedly supporting specification reference WebTrends identifies is not at all on point.[17]

The only other argument WebTrends advances in support of importing these limitations into the claims is that the structure or order of steps of the claims somehow require it because the claim first refers to generating a log, then to storing each of the events in the log in memory (claim 11 of the '510 patent) or storing the log in the associated user computer (claim 12 of the '680 patent). This is a weak reed. Generation or creation of the log data does not necessarily require that it be stored in memory, since data is generated first in a computer's central processing unit and then stored in memory. Goldberg Decl. ¶ 18. WebTrends' efforts to narrow the claims beyond what they themselves require should be rejected.

**7.    *Means For Interpreting The Logged Machine Operation Events By Reference To The Dictionary File (CCC row 18)***

The parties agree that dependent claim 9 of the '510 patent is written in "means- plus-function" format. Construing this element requires first determining the function of the element, and then identifying the corresponding structure for performing the function, as described in the specification. *See* NR Br. at 42, WT Br. at 20. As shown in the Claim Construction Chart at row 18, the parties agree on the function of the claim element in question, namely, "interpreting the logged machine operation events by reference to the dictionary file." What is in dispute is the application of the second prong of the inquiry. WebTrends contends that there is no structure

---

[17] The sole specification reference WebTrends cites (col. 2, l. 62 - col. 3, l. 5 of the '510 patent) contains none of these limitations and concerns, instead, the process of transferring the log data to the central processing computer.

disclosed in the specification that corresponds to this function, relying on *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 952-53 (Fed. Cir. 2007). WT Br. at 22.

To begin with, WebTrends' assertion of invalidity based on indefiniteness once again puts the validity cart before the claim construction horse. This is a claim construction proceeding, not a trial on validity; no evidentiary showing of indefiniteness has been made and the claims are presumed valid under 35 U.S.C. § 282.

Additionally, WebTrends' reliance on *Biomedino* is misplaced. Contrary to the suggestions in WebTrends' brief (at 21), the *Biomedino* case did not involve computers, algorithms or software. Furthermore, as the Federal Circuit explained, the case asked the very specific question whether "sufficient corresponding structure [is] disclosed when the specification simply recites that a claimed function can be performed by known methods or using known equipment." *Biomedino*, 490 F.3d at 951. Here, the corresponding structure of a computer programmed to perform the algorithm to accomplish the function is described in the specification without simple reliance on known methods or equipment.

Thus, as explained in NetRatings' Brief (and CCC row 18), the '510 patent specification describes a processing system programmed to recognize, or translate, the information contained in the data fields of a log entry as, or into, information useful for reporting purposes by reference to corresponding entries in the dictionary. NR Br. at 46-47. The '510 patent states that a "central processing station may be a micro processor based computer and may utilize a variety of commercially available and/or custom developed data base management systems to manage the computer use data base and create a customized data dictionary … provided to interpret the raw data provided by the event log files." '510 patent, col. 5, ll. 28-33. The specification provides examples of algorithms for performing the recited function and a description of the type of

18

interpretation that may be performed on logged events.  For example, the '510 patent provides a sample event log containing logged events, where the logged events include the event type of each logged event, such as "PANEL," "START," "ACTVT," "MINIM," or "RESTO."  '510 patent, col. 8, ll. 16-29 and col. 9, ll. 1-22.  The information contained in the data fields of each log entry are interpreted according to their respective event type.  For example, the event type "PANEL" stores the panelist's name and other identification information, and the event type "START" stores configuration information related to the meter.  '510 patent, col. 9, ll. 31-37.  In addition, the '510 patent describes how the labels used in the sample log file above, such as the labels *T* or *D*, are interpreted according to the type of information they identify, where, for example, *T* represents Windows title and *D* represents miscellaneous data. '510 patent, col. 9, ll. 38-46.

Thus, the '510 patent specification contains a description of algorithms by which a dictionary is used to convert or interpret event log data and algorithms for specific conversions of data in event logs.  This description provides sufficient corresponding structure to support the function of the means-plus-function element in claim 9 of a "means for interpreting the logged machine operation events by reference to the dictionary file."  Thus, one of ordinary skill in the art would be able to understand the structure disclosed in the '510 patent for performing the recited function.  *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999) ("the inquiry asks first whether structure *is* described in [the] specification, and, if so, whether one skilled in the art would identify the structure from that description").

## POINT II

### WEBTRENDS' PROPOSED CONSTRUCTIONS OF THE '155 AND '386 PATENT CLAIM TERMS SHOULD BE REJECTED AS WEBTRENDS FAILED TO OFFER ANY ARGUMENT TO SUPPORT MANY OF THESE TERMS AND OTHERWISE SIMPLY TRIES TO READ <u>SELECTED LIMITATIONS FROM EMBODIMENTS INTO THE CLAIMS</u>

**A.      The Court Should Adopt NetRatings' Constructions Of Claim Terms In The '155 And '386 Patents For Which WebTrends Has Not Even Attempted To Provide Any Supporting Rationale In Its Opening Brief**

WebTrends initially identified no fewer than 23 terms from the '155 and '386 patents which it contended require construction.  *See* Ostrow 9/19 Decl. Ex. J.  NetRatings only identified four terms from these patents as requiring construction.  *See* Ostrow 9/19 Decl. Ex. I. While the parties subsequently reduced the number of terms in dispute slightly (*see* NR Br. at 2, n.3), the claim construction chart still includes 19 terms from the '155 and '386 patents. WebTrends' proposed constructions are uniformly prolix and chock full of extraneous details, continuing its concerted effort to read selected limitations from exemplified embodiments in the specification into the claims.  NetRatings responded in detail to all of WebTrends' proposed constructions in its opening brief.  *See* NR Br. at 32-41.  Yet in its opening brief, WebTrends provides purported rationales for only eight of its proposed constructions of terms from the '155 and '386 patents.

For example, WebTrends proposed, as reflected in the claim construction chart, that "executable program" be construed as "a set of machine language instructions that constitute the output from the compilation of a source program."  CCC at row 19.  NetRatings instead provided the straightforward construction "computer program that can be run on a computer."  *Id*.  As NetRatings pointed out in its Opening Brief, not only is there no basis for WebTrends' construction, but it is inconceivable how it would assist any trier of fact in understanding the claim term.  NR Br. at 32.

However, for reasons of its own, as with so many other of its proposed constructions of terms from the '155 and '386 patents, WebTrends chose not to discuss the construction of "executable program" in its opening brief.  NetRatings should not be required to divine what, if any, rationales WebTrends may have for its unsupported, complicated constructions purportedly derived in some way from embodiments in the specifications.   Nor should WebTrends be allowed to proffer such belated rationales by way of a reply brief or at the Markman hearing in violation of the briefing schedule for claim construction and causing undue prejudice to NetRatings.

Accordingly, the Court should reject WebTrends' proposed constructions of terms from the '155 and '386 patents which do not rely solely on the plain meaning of those terms, but for which WebTrends has offered interpretative language and, yet, nevertheless, failed to provide any supporting rationale in its opening claim construction brief.   Thus, for this reason alone, in addition to the reasons set forth in NetRatings' opening brief, NetRatings' constructions of the terms presented in the claim construction chart at rows 19, 21, 24-26, 29-33, and 37 should be adopted by the Court.

**B.    WebTrends Mischaracterizes The Inventions Of The
'155 And '386 Patents And Its Proffered Constructions Uniformly
Depend On Reading Selected Limitations From The Specification Into The Claims**

**1.    *WebTrends Mischaracterizes The Inventions Of The '155 And '386 Patents As
Necessarily Involving A Software Program That Monitors A User's Interaction
With A Network Resource "Over A Period Of Time"***

As explained in NetRatings' Opening Brief (at 8 and 12), rounding out and building upon the core data collection mechanisms provided by the '510 and '680 patents and the '637 patent, the '155 and '386 patents provided additional ways of obtaining the monitoring software and

collecting specific details regarding Internet users' use and interaction with resources, such as web pages.[18]

The software that provides the monitoring functions to which these patents are directed comprises an "executable" (claims of the '155 patent) or "tracking" (claims of the '386 patent) program. Although this software is clearly described by the specification as being potentially capable of numerous monitoring functions, WebTrends has chosen to emphasize one such potential function, tracking user interaction with a network resource (*e.g.,* a web page) over time, and to improperly characterize the invention disclosed and claimed as being limited to and requiring that functionality. This approach is entirely contradicted by the plain language of the claims -- none of which contain such a limitation -- and numerous passages to the contrary in the specification.

Nowhere does the specification state that the sole object or function of the invention is to track user interaction with a network resource over time or that every embodiment of the invention requires that functionality. Instead, the specification makes clear that the "present invention relates to a method and apparatus for monitoring client use of and interaction with a resource downloaded from a server on a computer network…." '155 patent, col. 1, ll. 12-14. While tracking a user's interaction with a resource over time is disclosed as one embodiment that "may" be the subject of this monitoring functionality, other information that could be collected at the same time or in other embodiments includes, for example:

> the type and amount of information that was displayed or transferred. '155 patent, col. 4, ll. 15-19.

>          *         *         *

---

[18] The '155 and '386 patents resulted from respective continuation applications from the same parent and therefore share the same specification.

the tracking program can determine the URL of the Web page it is embedded in and may determine the amount of information downloaded by the client. '155 patent, col. 16, ll. 23-26.

*     *     *

the tracking program may determine the size of the fully rendered Web page. '155 patent, col. 16, ll. 50-51.

*     *     *

[an] ad banner may be provided with multiple links to other, diverse Web sites, such as Web sites relating to sports, entertainment, general information, technology, history, and the like. [In one embodiment] [t]he tracking program monitors which of the various links are selected and provides this information to the server. '155 patent, col. 14, ll. 43-49.

Thus, as the specification discloses:

The tracking program … monitor[s] various indicia, such as elapsed time, mouse events, keyboard events, and the like, in order to track the user's interaction with and use of the file or to monitor choices (such as selections or links to other resources or files) made by the user while within the file. The tracking program may also monitor the amount of data downloaded by the client. '155 patent, col. 4, ll. 50-57.

It could not be any clearer that the specification discloses numerous monitoring functions that the "executable" or "tracking" program may be programmed to perform. Monitoring usage over time is one possible functional embodiment but it is not required and there are many others that may be used separately or together. Moreover, as the Federal Circuit has held, "the claims measure the invention." *Phillips*, 415 F.3d at 1312. *See also supra* at 16.

For all of these reasons, WebTrends' mischaracterization of the diverse, possible monitoring functions of the inventions of the '155 and '386 patents as being limited to and necessarily involving a "timing functionality" (*see e.g.*, WT Br. at 41) has no support in the claims, is flatly contradicted by the disclosure of the specification and is contrary to the governing principles of claim construction.

23

2.    *tracking program (CCC at row 20)*

The term "tracking program" appears in both independent claims of the '386 patent

(claims 1 and 13).  NetRatings' proposed construction of this term is:

> computer readable code that monitors use of a computer.

CCC at row 20.

WebTrends' proposed construction is:

> A timer program that calculates the amount of time that a user uses a resource.

WT Br. at 45.

In support of its construction, WebTrends cites to specification passages it contends show

that the term "tracking program" in the '155 and '386 patents is consistently used to refer to a

program that (in WebTrends' words) "at minimum" and (as disclosed in the specification,

merely) "in its simplest form" is a "timer program."  WT Br. at 45.  WebTrends' logic is faulty:

the specification's characterization of the "timer program" as the "simplest form" of the tracking

program does not require that all other, more complex forms of the program necessarily include

the timer program functionality.

As shown in the immediately proceeding section above, no such timing requirement

appears anywhere in the intrinsic evidence.  Instead, what is required by the claims is that the

tracking program monitor use of or interaction with a resource, and the plain meaning of the

unqualified term "tracking program" as used in the claims is thus, as NetRatings has proposed:

computer readable code that monitors use of a computer.  As numerous passages in the

specification make clear, including those above, operating as a timer program is one possible

embodiment of the tracking program, but there are numerous other exemplified functions that the

tracking program can perform either separately or together, including with or without a timer

program.  This is simply another egregious example of WebTrends attempting, for result-driven

24

purposes relating to infringement analysis, to cherry-pick a limitation from an exemplified embodiment and reading it improperly into the claims.

Moreover, the claims of a related patent, U.S. Patent No. 5,796,952 (the "'952 patent"), a parent to the '386 patent, specifically include a "timer," which the claims of the '386 patent do not have.  *See* Ostrow 9/19 Decl. Ex. Y, '952 patent, col. 19, ll. 5-30.  Under the claim construction principle of claim differentiation, therefore, the claims of the '386 patent should not be construed as also requiring such a timer.  *See Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

### 3. *Monitor Interaction Through The Client Computer With At Least One Of The First Resource And One Or More Second Resources ('386 patent) (CCC at row 27); Monitor Use Of The Resource ('155 patent) (CCC at row 23)*

NetRatings' proposed construction of the terms quoted above is straightforward:  (i) monitor interaction through the user computer with a first or second resource – with respect to claims 1 and 13 of the '386 patent (CCC at row 27), and (ii) monitor use of the resource – with respect to claims 1, 33, 48, 51 of the '155 patent (CCC at row 23).  With respect to both of the claim terms, WebTrends again seeks to add a requirement that the functionality of the monitoring be limited to "keep[ing] track, over a period of time" of the actions of the user with respect to the relevant resource.  *Id.*  WebTrends' construction is premised on its faulty construction of "tracking program" as a "timer program" (WT Br. at 46, 48-49) and, therefore, should be rejected for all of the reasons discussed above as to why "tracking program" is not limited to a "timer program."

In addition, while WebTrends asserts (*id.*) that its construction is consistent with the ordinary meaning of "monitor" (to "watch, keep track of") it is evident, based on WebTrends' own definition that this is an inaccurate and incomplete conclusion.  As discussed above in the

25

context of "tracking program" there are many ways to monitor or keep track of a user's interaction with a network resource, *e.g.,* the amount of data downloaded, and those methods or informational objectives are by no means limited to a timer program, just as the plain meaning of "monitor" does not inherently require observing over a period of time.  For example, a user's interaction with a network resource could be monitored at a particular time or when a particular event occurs as opposed to over a period of time – an interpretation which is amply supported by the specification passages quoted in section B.1 above.

**4.**    ***Downloading Of The First Resource Causes Downloading Of The Tracking Program (CCC at row 35)***

NetRatings explained in its opening brief how several terms in the '155 and '386 patents which WebTrends contends need construction should instead be given their ordinary meaning in their own clear language and that no construction is necessary.  *See, e.g.*, CCC rows 35 and 36; *see* NR Br. at 39-40.  This applies to the term "downloading of the first resource causes downloading of the tracking program" whose meaning is plain.  CCC row 35; s*ee* NR Br. at 39.

WebTrends proposes the construction:

> As a result of downloading the first resource into the client computer's memory, the client computer is instructed to issue a further request to download the tracking program.

CCC row 35.

WebTrends candidly admits that its elaborate construction:

> reflects Davis' teaching of how the tracking program is downloaded <u>when it is a Java applet</u>.  **In this embodiment**, the tracking program is a separate Java applet that is stored separately from a Web page.

WT Br. at 44 (emphasis added).

WebTrends makes no attempt to justify its explicit and improper reading into the claims of limitations from one exemplary embodiment.  Moreover, the specification, in fact, expressly discloses that the relevant executable programs can be written in languages other than Java.  '386 patent at col. 17, ll. 49-50, 46-62.

There is simply no basis in the claims or the specification, to limit this term to require that a further request be made to download the tracking program.  The term "causes" as used here plainly has its ordinary meaning of making something happen but whether, for example, what happens (downloading of the tracking program) occurs at approximately the same time as the downloading of the first resource or occurs subsequently or only after a further request is made is not required and is not inherent in the meaning of the term "causes" generally or as used in the claims.

### 5.    *The One Or More Second Resources Having Been Obtained By The First Client From A Server Of The One Or More Servers As A Result Of Interaction Through The First Client With At Least One Of The First Resource And A Second Resource Of The One Or More Second Resources (CCC at row 36)*

WebTrends requested construction of this long phrase from independent claims 1 and 13 of the '386 patent, which NetRatings believes is readily understandable.  The construction WebTrends proposes is:

> Any "second resource" must have been obtained by the first client computer as a result of the first client computer's downloading of, or other interaction with, the first resource.

CCC at row 36; WT Br. at 46.

This is another unwarranted attempt to limit the plain language of the claims.  Specifically, WebTrends would in effect rewrite the end of the phrase -- "with at least one of the first resource and a second resource of the one or more resources" -- to read "with the first resource."  In its opening brief, NetRatings clarified that the end of the phrase instead means "with the first resource or a different second resource."  NR Br. at 39-40.  WebTrends asserts that its construction -- baldly deleting the option of "the second resource" clearly allowed by the claim language -- "reflects the teaching of the '386 patent."  WT Br. at 47.  However, once again, the specification passages WebTrends cites to are clearly designated as exemplary embodiments.

*See* '386 patent, col. 13, l. 28 and col. 14, l. 39.  In any event, the claim language is clear and requires no resort to the specification to rewrite it.

Furthermore, as explained in NetRatings' Brief, WebTrends' construction is wrong because there is no reason to interject "downloading" into the claim language which clearly specifies "interaction."  NR Br. at 40.

6.      ***The First Server And Second Server Comprising Two Servers (CCC at row 34)***

The claim term "the first server and second server comprising two servers" appears in claims 1, 33, 48, and 51 of the '155 patent.  NetRatings' construction is:

the first server is a different machine than the second server.

CCC at row 34.  The parties' disagreement focuses on a single point.  WebTrends asserts that each referenced server must have its own URL and "provides resources for users to download." *Id.*  Once again, WebTrends is taking an example from the specification and trying to read it into the claims as an absolute limitation.  WebTrends points to the specification at col. 5, ll. 39-41 which WebTrends characterizes as "explain[ing] that a server is specified as part of a URL." WT Br. at 48.  It is true that the particular server referenced in the embodiment discussed in that passage has a URL, but this passage obviously concerns this particular embodiment and makes no attempt to define what a server is generally for the purposes of the patent as a whole.  Thus, this passage discloses:

> After the HTML document is downloaded to the client, the graphical images are fetched using a TCP/IP connection by server resources specified by the one or more first URLs.

'155 patent, col. 5, ll. 39-41.  As the first sentence of the preceding paragraph makes clear, this concerns "one embodiment" of the invention.  Similarly, while the '155 and '386 patents do disclose that the tracking or executable program <u>may</u> be downloaded from a different server than the one from which the resource was downloaded, there is no requirement in the specification

that every server utilized in connection with the practice of the invention must provide resources for users to download.  As set forth in NetRatings' Brief (at 38, n.22), the ordinary meaning of server is a "computer or device on a network that manages network resources."  There is no requirement in the intrinsic evidence that every server utilized in connection with the invention be a uniquely addressable computer system having its own URL.

Finally, WebTrends is simply wrong in asserting that NetRatings' construction is ambiguous or conflates a "server" with a "machine."  Clearly, servers are machines but not all machines are servers.  The claim language at issue here is clear, as is NetRatings' construction: the claim language refers to a "first" and a "second" server as "comprising two servers;" NetRatings' construction simply clarifies that the first and second server are different servers in that they are different machines, although they may, for example, be the same *type* or *configuration* of server.

### 7. *Executable Program Not Being Part Of The Resource (CCC Row at 22)*

The term "executable program not being part of the resource" appears in claims 1, 33, 48 and 51 of the '155 patent.  NetRatings' construction is: the executable program not contained within the resource.  CCC at row 22.  WebTrends' construction is:  the executable program is neither contained within the resource nor incorporated in it by reference.  *Id*.  Thus, the dispute here is whether the claim term excludes the executable program being incorporated by reference as WebTrends contends.

As set forth in NetRatings' Brief, the patent clearly contemplates a program being embedded in a resource, such as a web page, even though the program is not contained within the web page, i.e., not contained within the text of the page, but instead "embedded" in it such that it may be obtained by a link (and thus incorporated by reference).  NR Br. at 33-34.

WebTrends' construction is not required by the claim language and would preclude a contemplated embodiment involving such an embedded link; it should, therefore, be rejected.

Moreover, WebTrends' construction *directly contradicts* claims 29 and 30, which depend from claim 1 and therefore include all of the aspects of claim 1. These claims describe the embodiment just discussed, that is, in which the executable program is located at a first address on the second server, which address is embedded in the resource, and is downloaded in response to specification of that address. This embodiment, which is thereby expressly included as a possible embodiment covered by claim 1, is exactly what WebTrends argues is excluded by the claim term "the executable program not being part of the resource." WebTrends' construction here results in a violation of the basic tenet of claim construction that claim terms should, first and foremost, be construed by reference to the claims themselves.

WebTrends contends that NetRatings' construction would make this claim meaningless, purportedly because the claim already requires the resource to be on the first server and the program to be on the second server. WT Br. at 49-50. This misses the point or is disingenuous, as these two requirements of the claim are independent of one another. On the one hand, the resource could be on the first server but there could be, as the specification contemplates, a link to the program (located on the second server) which is embedded in the resource, an embodiment improperly excluded by WebTrends' construction. On the other hand, the code for the executable program could be on the second server and also be part of, i.e., contained within, the resource. NetRatings' construction thus properly accounts for the dual requirements of the claims of the '155 patent -- that the executable program both be not part of the recourse and be downloaded from the second server -- and should be adopted by the Court.

8.  *Client Identifying Indicia (CCC at row 28)*

The term "client identifying indicia" appears in asserted independent claims 1 and 33 of

the '155 patent.  NetRatings' proposed construction of this term is:

Any information that can be used to associate data with a client

CCC at row 28.

WebTrends' proposed construction is:

Information that uniquely identifies the client

WT Br. at 50.

As noted in NetRatings' Opening Brief, WebTrends' construction is incorrect because it

adds the limitation that the information identify the client "uniquely."  NR Br. at 36.  Nowhere in

the specification or intrinsic evidence is anything close to such a limitation described or

suggested.  Indeed, only once in the '155 patent is the word "unique" used, and it is not in the

context of discussing client identifying indicia or the information collected by the executable

program.  *See* '155 patent, col. 1, ll. 35-39 ("The techniques utilized in many private networks

for monitoring client use and interaction do not lend themselves to public networks. For

example, user access to a server in private networks is generally obtained through the use of a

unique identification number provided by the server.").  Moreover, the fact that the specification

recognizes that a user may have a "unique identification number" while no such language is

included in the specification discussion regarding client identifying indicia or in the claims,

reinforces the conclusion that no such limitation was intended; nor should it be included now as

WebTrends' construction would require.  This is also another instance where WebTrends'

assertion that its construction is "consistent with the plain meaning" of the claim language is

belied by WebTrends' need to add a limiting qualifier, in this case, "uniquely," to terms which,

by themselves, do not convey the same meaning in the absence of the added qualifier.  If, for

31

example, "identify" meant "uniquely identify", which it does not, there would be no need to add the modifier "uniquely."

WebTrends complains that NetRatings' construction encompasses "data that does not identify a client." WT Br. at 50. That is clearly not so. NetRatings' construction requires it to be "any information that can be used to associate data with a client," which would necessarily require some level of identification of the client, that is, the level the '155 patent requires to accomplish an objective of the invention. NR Br. at 36. NetRatings' construction should be adopted.

## POINT III

### WEBTRENDS' PROPOSED CONSTRUCTIONS
### OF THE '637 PATENT ARE FATALLY FLAWED

**A.    WebTrends Fundamentally Mischaracterizes The Inventions Of The '637 Patent, Misapplies The Governing Law Under 35 U.S.C. § 112(6) And, In Making Indefiniteness Arguments, Ignores Corresponding Structure Disclosed In The Specification**

As explained in NetRatings' Opening Brief, the inventions of the '637 patent took the technology disclosed and claimed in the '510 and '680 patents a step further by disclosing and claiming improved ways of delivering computer code to user computers over a network and for monitoring the display and observation of content provided to such users over the network. *See* NR Br. at 7-8, 10; '637 patent, col. 1, ll. 5-12. For example, in one embodiment (shown in Figures 3A, 3B and 3C of the '637 patent), a web page requested by a user is provided by a website, and the computer code for monitoring the display of the web page is transferred with the web page to the user computer where it monitors information about the display of the web page, such as its size, position and whether it was displayed at the same time as another web page. NR

Br. at 10.  *See e.g.*, '637 patent, col. 13, ll. 30-67.  The collected information is then sent either to the content provider (Fig. 3C) or to a third party.

As is evident from this brief description and from even a cursory review of the patent, the inventions of the '637 patent are these techniques as disclosed and claimed therein.  What computer languages the computer program(s) which accomplish these functions are written in is not important.  As expressly stated in the specification (e.g., '637 patent, col. 25, ll. 38-44), the invention is not limited to a particularized computer program written in a single computer programming language.  Nevertheless, WebTrends, bent once again on narrowing the claims to selected embodiments (or limitations from selected embodiments), contends (e.g., WT Br. at 22-23) that a number of the asserted claims which have means-plus-function elements must be limited to a specific Java applet on the asserted ground that no other corresponding structure is disclosed.  However, as further shown below, express statements and examples in the specification contradict this position.

With respect to other claims having means-plus-function elements, WebTrends asserts that a number of these claim elements reciting a particular function have no corresponding structure in the specification which, WebTrends asserts, renders them invalid as indefinite.  *See, e.g.*, WT Br. at 25-26.  However, as further shown below, the structure for such elements is clearly set forth in the specification, which describes a set of computer instructions which cause the computer system(s) involved to perform the recited function.  These computer instructions, as previously shown in NetRatings' Opening Brief (at 43-46), are described in the specification passages cited by NetRatings in the CCC for each of the relevant claim terms.  WebTrends makes the broad assertion (*e.g.,* WT Br. at 26) that NetRatings has not shown how the structure disclosed in these passages is linked to the recited function (in effect criticizing NetRatings' for

not turning the CCC into a claim construction brief), but rather than attempting to examine the specification passages NetRatings has included in the CCC as providing corresponding structure for the means-plus-function elements in issue, WebTrends prefers to simply ignore them. But denying the existence of these passages does not make them go away (as WebTrends wishes). Illustrative examples of such corresponding structure disclosed in such passages are discussed further below.

Finally, with respect to another set of claims in the '637 patent (claims 57, 59, 62, 64, and 65), WebTrends asserts (e.g. WT Br. at 25) that the "instruction" elements in those claims should be treated as means-plus-function elements under 35 U.S.C. § 112(6). However, as shown in NetRatings' Opening Brief (at 47-48) and further demonstrated below, WebTrends has failed to overcome the presumption that these are not means-plus-function elements that arise from the absence of "means" language, and, moreover, it is clear under the governing law that, because these "instruction" elements refer to computer code encoded on computer readable media, the claims identify sufficient structure to avoid the application of § 112(6). *See e.g., Trading Technologies Int'l, Inc. v. ESpeed, Inc*., No. 1:04-cv-05312, 2006 WL 3147697, at *12 (N.D. Ill. Oct. 31, 2006) (finding "program code" to provide sufficient structure to remove it from § 112(6)) and cases cited therein; *see also, Alacritech v. Microsoft Corp*., No. 3:04-cv-03284, 2005 WL 850729, at *3 (N.D. Cal. Apr. 12, 2005) (holding the term "a set of instructions executable on a processor" discloses sufficient structure to avoid application of § 112(6)).

**B.  The Structures Disclosed In The Specification Corresponding To Various Means-Plus-Function Elements In The Claims Are Not Limited To The Exemplified Java Applet Embodiment Disclosed, But Are Instead The Set Of Computer Instructions Described In The Specification For Performing The Respective Recited Functions**

With respect to a number of asserted claims of the '637 patent having clauses which the parties agree are in means-plus-function format,[19] WebTrends asserts that the structure corresponding to the recited function is a particular Java applet which is an exemplified embodiment disclosed in the specification.  In each instance, WebTrends contends that the illustrative Java applet exemplified is the only structure clearly linked to the relevant recited function.[20]  *See* WT Br. at 26-28, 31-37.  WebTrends' position is wrong on the law and fails to account for the fact that the specification makes clear that the computer instructions which cause the computer to perform the relevant recited function can be implemented using any appropriate computer programming language.

First, on the legal issue of how structure is identified in the context of computer program claims having means-plus-function elements, as the Federal Circuit held in *WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999), the structure is determined by the **algorithms** disclosed in the specification, not what specific computer **language** is disclosed.  *See also* NR Br. at 42.  WebTrends cites no case law, nor offers any rationale other than conclusory assertions, that support its unfounded contention that in the context of computer program claims written in means-plus-function format and which describe a certain function, the corresponding

---

[19] Claims 11, 18, 20, 25, 28, 30, 33, 35, and 36.

[20] WebTrends also disagrees in certain respects with NetRatings as to what the recited function is of certain of these claim elements, e.g., as to claims 11, 28 and 33, WebTrends' asserts (similar to its contentions as to the '510 and '680 patents) that the recited monitoring function occurs "over a period of time," as opposed to NetRatings' construction of "at two or more times" (CCC at row 38) which does not selectively read a limitation from an illustrative embodiment into the claims as does WebTrends' construction.  However, in any event, whether the corresponding structures are limited to exemplified Java applets, as WebTrends contends, or to the relevant set of computer instructions for performing the recited function, as NetRatings maintains, does not turn on the disputes between the parties about certain details of the recited functions.

structure is limited to the details of an illustrative embodiment of a computer program (here the Java applet examples) written in a specific language, as opposed to the relevant structure being the computer instructions (regardless of what computer programming language they are in) which cause the computer to perform the recited function.

Moreover, the Federal Circuit has held that "[i]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, [the court] will generally construe the term to cover all known types of structure that the patent disclosure supports." *CCS Fitness v. Brunswick Corp*., 288 F.3d 1359, 1366 (Fed. Cir. 2002). While an accused infringer may "narrow a claim term's ordinary meaning . . . he cannot do so by simply pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Id. See also Fonar Corp. v. General Elec. Co*., 107 F.3d 1543, 1549 (Fed. Cir. 1997) ("[a]s a general rule, where software constitutes part of a best mode of carrying out an invention, description of such a best mode is satisfied by a disclosure of the functions of the software. This is because, normally, writing code for such software is within the skill of the art, not requiring undue experimentation, once its functions have been disclosed.")

As to the disclosure of structure in the '637 patent, the specification clearly states that the computer program of the invention is not limited to a Java applet, which is simply described as one embodiment wherein a particular programming language is used and that other languages may also be used. For example, the '637 patent discloses:

> In a particular embodiment, the monitoring instructions are part of a computer program that also includes instructions for displaying the content. **Illustratively**, such a computer program **can be** an applet written in the Java programming language. '637 patent, col. 11, ll. 59-63 (emphasis supplied).

More generally, the specification expressly discloses:

> When the invention is used with a computer network or to monitor display of content by a computer system, aspects of the invention can be implemented as one

36

> or more computer programs that can be executed by a computer to achieve the functionality of that aspect.    Generally, such computer programs can be implemented using any appropriate computer programming language.  However, when an aspect of the invention is used with a computer network that includes computers of many different types (such as the internet), the computer programming language is preferably one that can be executed by any type of computer (i.e., the computer programming language is platform independent). The Java programming language, developed by Sun Microsystems, Inc. of Mountain View, Calif., is one such computer programming language.  Below, some aspects of the invention are described, for purposes of illustration, as implemented in the Java programming language.  Again, however, none of the aspects of the invention are limited to such implementation.  (637 patent, col. 11, ll. 38-56, emphasis supplied).
>
> *                    *                    *
>
> [T]hough an implementation of the invention has been described in which aspects of the Java programming language are used, it is to be understood that [the] invention is not limited to such implementation; other programming languages could be used having other features and characteristics (e.g., the language need not be an object-oriented language as is Java.)  '637 patent, col. 25, ll. 38-44 (emphasis supplied).

Not surprisingly, since the computer instructions for the functions of the invention do not depend on Java or any other computer programming language, neither the Java programming language nor any specific Java applet is even mentioned in the lengthy "Summary of the Invention" section of the specification which runs from col. 6 to col. 9, and is not mentioned even in the "Detailed Description of the Invention" section (which begins in col. 9) until (in col. 11, l. 49) just before illustrative examples are discussed.

Thus, the '637 patent clearly indicates that the structure for performing the recited functions of the means-plus-function claim elements is computer instructions which may be in the form of a computer program.  But nowhere does the specification require a specific type of computer program or computer programming language.

Moreover, WebTrends seeks to add in its recitation of the structure of these elements that the Java applet operates "to cause content to be displayed within a window."  CCC at rows 38 and 40.  WebTrends, however, admits that the functions performed by these means-plus-function

37

elements do *not* include the function of displaying content within a window.  *See* CCC at row 38 (function is "monitoring the change … in the appearance of a content display) and row 40 (function is "monitoring the display of content to produce information about the display of content.").  WebTrends fails to provide any explanation as to why the function of displaying content within a window, which is not performed by the claimed function, should form part of the structure of these elements.  Instead, WebTrends simply slips it into its proposed construction in the hopes of getting away with adding yet another detail into the claims where it does not belong.

Accordingly, WebTrends' request to have all of these means-plus-function elements limited to specific illustrative Java applets should be denied and NetRatings' proposed constructions of these claims should be adopted.

**C.    WebTrends' Assertion That Various Terms In The '637 Patent Are Indefinite, And Hence Invalid, Is Out Of Place In This Claim Construction Proceeding, Misapplies The Law On Identifying Structure Corresponding To Functions Recited In The Claims And Ignores The Numerous Specification Passages Disclosing Corresponding Structure**

WebTrends contends that several terms of the '637 patent are indefinite on the alleged grounds that the patent fails to disclose corresponding structure.  WT Br. at 25-26, 28-31.  To begin with, as noted above, making validity arguments now is to "put the validity cart before the claim construction horse."  *Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368-69 (Fed. Cir. 2005).  The claims of the patent are entitled to a presumption of validity under 35 U.S.C. § 282, and WebTrends has not remotely made a showing by clear and convincing evidence of invalidity and the *Markman* hearing is not the place to address those evidentiary issues.[21]

---

[21] For example, as the Federal Circuit has held: "Under our case law interpreting § 112 (6), knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of

In addition, here again WebTrends is misapplying the law relating to how structures which correspond to a recited function in the claims are identified in the specification. For the reasons stated above, the specific algorithm that constitutes the structure is the computer code which is programmed to carry out the recited function. *See also* NR Br. at 42-43. And, the specification plainly contains corresponding structure with respect to the three claim terms, which WebTrends asserts are indefinite.

1. *means for evaluating the change in time of the characteristic of the content display to produce monitoring information (CCC at row 39)*

With respect to this recited function, the specification states that in some embodiments:

The monitoring method can also determine when the on-screen pointer leaves the defined area after each entry, by monitoring another event that indicates that the pointer has exited the area defined by the content display. *The time stamps associated with the entry into and exit from the defined area can be used to calculate the duration of time that the pointer was in the defined area for each entry into the defined area, as well as the total duration of time that the pointer was within the defined area.* '637 patent, col. 16, ll. 46-50 (emphasis supplied)

\*                    \*                    \*

The change in time of this characteristic is evaluated to produce monitoring information. *The evaluation can be accomplished, for example, by further monitoring the change in time of a characteristic of the computer system used to display the content, and comparing the change in time of the characteristic of the content display to the change in time of the characteristic of the computer system.* '637 patent, col. 16, l. 63 - col. 17, l. 2 (emphasis supplied)

These and the other specification citations in NetRatings' construction clearly set forth the structure disclosed in the specification corresponding to this claim limitation.

2. *means for transferring the monitoring information from the content display site to a remote site of the network that is different from the content provider site (CCC at row 44)*

With respect to this recited function, the specification states, among other things, the following about embodiments of the invention:

---

satisfying the statutory requirement of definiteness." *Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002).

In yet a further aspect of the invention, the display of content that is provided by a content provider site over a network to the content display site is monitored to produce monitoring information, *then the monitoring information is transferred to a remote site of the network that is different from the content provider site.* According to this aspect, *the monitoring information can first be transferred to the content providing site before eventual transfer to the remote site,* so long as the monitoring information cannot be stored at the content provider site, or accessed or manipulated at the content provider site before transfer to the remote site ....'637 patent, col. 8, ll. 50-60 (emphasis supplied).

\* \* \*

In this embodiment of the invention, the monitoring information obtained at the content display site 302 is transferred to the application manager site 501, either directly from the content display site 302 or indirectly via the content provider site 301. If the latter, then *the monitoring information can be received by the content provider site 301 and transferred to the application manager site 501* in a way that prevents access to the monitoring information at the content provider site 301. For example, the monitoring information could be encrypted at the content display site 302 before transfer to the content provider site 301, the decryption method being available only at the application manager site 501. *Or, the monitoring information could be immediately transferred to the application manager site 501 after being received at the content provider site 301.* '637 patent, col. 22, ll. 25-40 (emphasis supplied).

These and other specification citations contained in NetRatings' construction disclose structure corresponding to this claimed element.

**3.**    ***means for accessing the monitoring information stored at the remote site from a site on the network other than the remote site, such that a user at the other site can interact with the monitoring information, but cannot modify the monitoring information (CCC at row 46)***

With respect to this recited function, the specification states (referring to figures 5A, 5B, and 5C) that in embodiments of the invention:

The monitoring information can be presented for observation through a suitable user interface, such as a graphical user interface (GUI), in any desired format, e.g., graphs, bar charts, pie charts. The monitoring information stored in the database *can also be subjected to further analysis if desired.* For example, *the total time that a content display is available to be viewed can be broken down* into percentages of time that the content display was unobstructed, partially hidden and fully hidden. Or, *the percentage of observers of a set of content that select a particular hyperlink while observing the content can be identified.* '637 patent, col. 21, ll. 21-32 (emphasis supplied).

*   *   *

a user interface (e.g., GUI) can be provided on the content provider site computer *to enable the owner (or representative) of the content provider site to access monitoring information stored at the application manager site regarding content displays* provided by the content provider site. *Such an interface can also be configured to enable the content provider to create a new account on the application manager computer, authorize payments for use of the monitoring system of the invention, and request particular analysis or presentation of obtained monitoring information.* '637 patent, col. 23, ll. 15-24 (emphasis supplied).

Hence, despite WebTrends' complaint that there is no structure for preventing the user at the other site from modifying the monitoring information, the specification does disclose corresponding structure consisting of computer code encoded on a computer readable medium, that, when executed by a computer system, performs encryption such that "a user at the other site" can interact with the monitoring information, but cannot modify the monitoring information.

## D. The "Instructions" Elements Are Not Means-Plus-Function Elements And, Therefore, Are Not Subject To Section 112(6) And Should Be Given Their Plain And Ordinary Meaning

In its opening brief, WebTrends argues that even those claim limitations of the '637 patent which are not written in means-plus-function form should be construed according to the special rule in 35 U.S.C. § 112(6) for means-plus-function claims. WT Br. at 25. Specifically, WebTrends contends that asserted claims 57, 59, 62, 64, and 65, none of which include any "means for" language but instead recite "instructions," lack specific structure recited within the claims and are therefore actually means-plus-function claims. *Id.*

WebTrends' argument is fatally flawed. Its opening brief does not even acknowledge the strong presumption that the "instructions" claim elements, which do not recite "means for" language, are not subject to § 112(6). *See Phillips*, 415 F.3d at 1311 (absence of such language

creates a rebuttable presumption that 35 U.S.C. § 112(6) does not apply); *see also* NR Br. at 47-48.  Courts have "seldom held that a limitation not using the term 'means' must be considered to be in means-plus-function form," and "the circumstances must be [unusual] to overcome the presumption."  *Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed. Cir. 2006) citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1362 (Fed. Cir. 2004).  Since other claims of the '637 patent <u>do</u> use "means for" language, the claim construction principle of claim differentiation also undercuts WebTrends' position.  That is, the fact that there are two types of claims, which each use different words, gives rise to an additional presumption that the claims mean different things and have different scope.  *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

WebTrends' sole argument to overcome these unacknowledged presumptions is that these claims "include limitations that recite functions to be performed by the invention, without also identifying the specific structures that should perform these functions."  WT Br. at 25.[22]

To begin with, WebTrends' argument entirely disregards the preamble of every claim containing the "instructions" clause in issue, which preamble is not present in the "means for" claims: "**<u>A computer readable medium</u>** encoded with one or more computer programs … comprising instructions …."  '637 patent, claims 57, 59, 64 and 65 (emphasis added).[23]  Thus, in

---

[22] WebTrends refers (WT Br. at 25, n.17) to a previous litigation involving the '637 patent in which the District Court for the District of Delaware issued an interim order requesting additional briefing on the construction of *certain of* the "instructions" terms at issue after concluding that the defendant had overcome the presumption against applying § 112(6) to "most of" those terms.  WebTrends neglects to mention that this order, which contains no detailed explanation of the preliminary holding, *has been vacated* and therefore can have no bearing in this action. *See* Ostrow 10/19 Decl. Ex. D, Order entered on October 30, 2006 in the case captioned *NetRatings, Inc. v. Coremetrics, Inc.*, 05-314-GMS (D. Del.).

[23] Asserted dependent claim 62 similarly begins "A computer readable medium as in claim 59 …."

fact, each claim in which "instructions for" appears is a computer media claim, which provides more than sufficient structure in and of itself, and plainly distinguishes the instructions claims from the means claims.  *See Trading Technologies Int'l, Inc. v. E-Speed, Inc*., 2006 WL 3147697, *13 (recognizing that "**computer-readable mediums** … are known in the art to include a structural component" and holding that "program code" recited sufficient structure (emphasis added)).

Moreover, the law is clear that computer code that is stated to perform a certain function recites sufficient structure to avoid the application of  § 112(6).  *Affymetrix, Inc. v. Hyseq, Inc*., 132 F. Supp. 2d 1212, 1231 (N.D. Cal. 2001), ("§ 112, P 6 does not apply to the terms recited in the form, "computer code that [performs x function];" "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions."); *Alacritech, Inc. v. Microsoft Corp*., 2005 WL 850729, *3 (holding that claim term "'a set of instructions executable on a processor' sufficiently discloses the structure as software," avoiding application of § 112(6)).

Even if "instructions" are considered to be a general category of structure, this is not sufficient to overcome the presumption against applying § 112(6) to claims without "means for" language.  As discussed in *Lighting World v. Birchwood Lighting, Inc.,* 382 F.3d 1354 (Fed. Cir. 2004), "[i]n considering whether a claim term recites sufficient structure to avoid application of § 112 P 6, we have not required the claim term to denote a specific structure."  *Id.* at 1359. Instead "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function."  *Id*.  "Instructions" is clearly a term that is "used in common parlance or by persons of skill in the pertinent art" and understood to be

computer code, as recognized by WebTrends' expert, who describes in his declaration that a server sends a Web browser "instructions relating to the layout of and user interaction with the Web page. The instructions are typically written in one of two computer languages: Hypertext Markup Language ("HTML"), or JavaScript." Walsh Decl. ¶ 18.

For the above reasons and those set forth in NetRatings' Opening Brief (at 47-48), WebTrends' argument that the "instructions" claims of the '637 patent should receive means-plus-function treatment should be rejected. NetRatings' proposed constructions for claims 57, 59, 62, 64, and 65 of the '637 patent should be adopted by the Court.

## CONCLUSION

For all the reasons stated above, NetRatings requests that the disputed claim terms be

construed in the manner proposed by NetRatings in the attached Claim Construction Chart.


Dated: New York, New York
         October 19, 2007                          DREIER LLP

                                                   /s/Seth H. Ostrow
                                                   SETH H. OSTROW (*Admitted pro hac vice*)
                                                   ARIANNA FRANKL (*Admitted pro hac vice*)
                                                   KARINE LOUIS (*Admitted pro hac vice*)
                                                   DREIER LLP
                                                   499 Park Avenue
                                                   New York, New York 10022
                                                   Telephone: (212) 328-6100
                                                   Facsimile: (212) 328-6101
                                                   sostrow@dreierllp.com
                                                   afrankl@dreierllp.com
                                                   klouis@dreierllp.com

                                                   DAVID P. COOPER, OSB NO. 88036
                                                   ELIZABETH A. TEDESCO, OSB NO. 05093
                                                   KOLISCH HARTWELL, P.C.
                                                   520 SW Yamhill Street, Suite 200
                                                   Portland, Oregon 97204
                                                   Telephone: (503) 224-6655
                                                   Facsimile: (503) 295-6679
                                                   cooper@khpatent.com
                                                   tedesco@khpatent.com

                                                   Attorneys for Plaintiff NetRatings, Inc.